WATSON ET AL. *v.* CITY OF MEMPHIS ET AL.

No. 424.   Argued April 17–18, 1963.   Decided May 27, 1963.

527

*Constance Baker Motley* argued the cause for petitioners. With her on the brief were *Jack Greenberg, Derrick A. Bell, Jr.* and *H. T. Lockard.*

*Thomas R. Prewitt* argued the cause for respondents. With him on the brief were *J. S. Allen, Walter Chandler* and *Frank B. Gianotti, Jr.*

*Solicitor General Cox, Assistant Attorney General Marshall, J. William Doolittle, Harold H. Greene, Isabel L. Blair* and *Gerald P. Choppin* filed a brief for the United States, as *amicus curiae,* urging reversal.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

The issue in this case, simply stated, is whether the City of Memphis may further delay in meeting fully its constitutional obligation under the Fourteenth Amendment to desegregate its public parks and other municipal recreational facilities.

The petitioners, adult Negro residents of Memphis, commenced this action against the city in May 1960 in the United States District Court for the Western District of Tennessee, seeking declaratory and injunctive relief directing immediate desegregation of municipal parks and other city owned or operated recreational facilities from which Negroes were then still excluded. The city denied neither the fact that the majority of the relevant facilities were operated on a segregated basis nor its duty under the Fourteenth Amendment to terminate its policy of conditioning use of such facilities on race. Instead, it pointed to the partial desegregation already effected and attempted to justify its further delay in conforming fully and at once to constitutional mandates by urging the need and wisdom of proceeding slowly and gradually in its desegregation efforts.

The District Court denied the relief sought by the petitioners and ordered the city to submit, within six months, a plan providing additional time for desegregation of the relevant facilities.[1] The Court of Appeals for the Sixth Circuit affirmed. 303 F. 2d 863. We granted certiorari, 371 U. S. 909, to consider the important question presented and the applicability here of the principles enunciated by this Court in the second *Brown* decision, *Brown* v. *Board of Education,* 349 U. S. 294, upon which the

---

[1] The plan ultimately formulated, though not part of the record here, was described in oral argument before the Court of Appeals. It does not provide for complete desegregation of all facilities until 1971.

courts below relied in further delaying complete vindication of the petitioners' constitutional rights.

We find the second *Brown* decision to be inapplicable here and accordingly reverse the judgment below.

## I.

It is important at the outset to note the chronological context in which the city makes its claim to entitlement to additional time within which to work out complete elimination of racial barriers to use of the public facilities here involved. It is now more than nine years since this Court held in the first *Brown* decision, *Brown* v. *Board of Education,* 347 U. S. 483, that racial segregation in state public schools violates the Equal Protection Clause of the Fourteenth Amendment. And it was almost eight years ago—in 1955, the year after the decision on the merits in *Brown*—that the constitutional proscription of state enforced racial segregation was found to apply to public recreational facilities. See *Dawson* v. *Mayor and City Council of Baltimore,* 220 F. 2d 386, aff'd, 350 U. S. 877; see also *Muir* v. *Louisville Park Theatrical Assn.,* 347 U. S. 971.

Thus, the applicability here of the factors and reasoning relied on in framing the 1955 decree in the second *Brown* decision, *supra,* which contemplated the possible need of some limited delay in effecting total desegregation of public schools, must be considered not only in the context of factual similarities, if any, between that case and this one, but also in light of the significant fact that the governing constitutional principles no longer bear the imprint of newly enunciated doctrine. In considering the appropriateness of the equitable decree entered below inviting a plan calling for an even longer delay in effecting desegregation, we cannot ignore the passage of a substantial period of time since the original declaration of the manifest unconstitutionality of racial practices

such as are here challenged, the repeated and numerous decisions giving notice of such illegality,[2] and the many intervening opportunities heretofore available to attain the equality of treatment which the Fourteenth Amendment commands the States to achieve. These factors must inevitably and substantially temper the present import of such broad policy considerations as may have underlain, even in part, the form of decree ultimately framed in the *Brown* case. Given the extended time which has elapsed, it is far from clear that the mandate of the second *Brown* decision requiring that desegregation proceed with "all deliberate speed" would today be fully satisfied by types of plans or programs for desegregation of public educational facilities which eight years ago might have been deemed sufficient. *Brown* never contemplated that the concept of "deliberate speed" would countenance indefinite delay in elimination of racial barriers in schools, let alone other public facilities not involving the same physical problems or comparable conditions.

## II.

When, in 1954, in the first *Brown* decision, this Court declared the constitutional impermissibility of racial segregation in public schools, it did not immediately frame

---

[2] See, e. g., *Dawson* v. *Mayor and City Council of Baltimore*, 220 F. 2d 386, aff'd, 350 U. S. 877 (beaches and bathhouses); *New Orleans City Park Improvement Assn.* v. *Detiege*, 252 F. 2d 122, aff'd, 358 U. S. 54 (golf courses and other facilities); *City of St. Petersburg* v. *Alsup*, 238 F. 2d 830 (beach and swimming pools); *Tate* v. *Department of Conservation and Development*, 133 F. Supp. 53, aff'd, 231 F. 2d 615, cert. denied, 352 U. S. 838 (parks); *Moorhead* v. *City of Fort Lauderdale*, 152 F. Supp. 131, aff'd, 248 F. 2d 544 (golf course); *Fayson* v. *Beard*, 134 F. Supp. 379 (parks); *Holley* v. *City of Portsmouth*, 150 F. Supp. 6 (golf course); *Ward* v. *City of Miami*, 151 F. Supp. 593 (golf course); *Willie* v. *Harris County*, 202 F. Supp. 549 (park). It is noteworthy that in none of these cases was the possibility of delay in effecting desegregation even considered.

a decree, but instead invited and heard further argument on the question of relief. In its subsequent opinion, the Court noted that "[f]ull implementation of these [applicable] constitutional principles may require solution of varied local school problems" and indicated an appropriate scope for the application of equitable principles consistent with both public and private need and for "exercise of [the] . . . traditional attributes of equity power." 349 U. S., at 299–300. The District Courts to which the cases there under consideration were remanded were invested with a discretion appropriate to ultimate fashioning of detailed relief consonant with properly cognizable local conditions. This did not mean, however, that the discretion was even then unfettered or exercisable without restraint. Basic to the remand was the concept that desegregation must proceed with "all deliberate speed," and the problems which might be considered and which might justify a decree requiring something less than immediate and total desegregation were severely delimited. Hostility to the constitutional precepts underlying the original decision was expressly and firmly pretermitted as such an operative factor. *Id.*, at 300.

The nature of the ultimate resolution effected in the second *Brown* decision largely reflected no more than a recognition of the unusual and particular problems inhering in desegregating large numbers of schools throughout the country. The careful specification of factors relevant to a determination whether any delay in complying fully and completely with the constitutional mandate would be warranted demonstrated a concern that delay not be conditioned upon insufficient reasons or, in any event, tolerated unless it imperatively and compellingly appeared unavoidable.

This case presents no obvious occasion for the application of *Brown.* We are not here confronted with attempted desegregation of a local school system with

· any or all of the perhaps uniquely attendant problems, administrative and other, specified in the second. *Brown* decision as proper considerations in weighing the need for further delay in vindicating the Fourteenth Amendment rights of petitioners.[3]   Desegregation of parks and other recreational facilities does not present the same kinds of cognizable difficulties inhering in elimination of racial classification in schools, at which attendance is compulsory, the adequacy of teachers and facilities crucial, and questions of geographic assignment often of major significance.[4]

Most importantly, of course, it must be recognized that even the delay countenanced by *Brown* was a necessary, albeit significant, adaptation of the usual principle that any deprivation of constitutional rights calls for prompt .

---

[3] The factors set out by the Court in the second *Brown* decision were "problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems." 349 U. S., at 300–301.

[4] Recognition of the possible need for delay has not even been extended to desegregation of state colleges or universities in which like problems were not presented. See, *e. g., Florida ex rel. Hawkins* v. *Board of Control,* 350 U. S. 413, where, in remanding on the authority of *Brown,* this Court said that "[a]s this case involves the admission of a Negro to a graduate professional school, there is no reason for delay. He is entitled to prompt admission under the rules and regulations applicable to other qualified candidates." 350 U. S., at 414.   See also *Lucy* v. *Adams,* 350 U. S. 1.   Similarly, both before and after *Brown,* delay has neither been suggested nor countenanced in eliminating operation of racial barriers with respect to transportation, *e. g., Boynton* v. *Virginia,* 364 U. S. 454; *Henderson* v. *United States,* 339 U. S. 816; *Morgan* v. *Virginia,* 328 U. S. 373; *Browder* v. *Gayle,* 142 F. Supp. 707, aff'd, 352 U. S. 903; voting, *e. g., Schnell* v. *Davis,* 336 U. S. 933; *Smith* v. *Allwright,* 321 U. S. 649; racial

rectification. The rights here asserted are, like all such rights, *present* rights; they are not merely hopes to some *future* enjoyment of some formalistic constitutional promise. The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled.[5] The second *Brown* decision is but a narrowly drawn, and carefully limited, qualification upon usual precepts of constitutional adjudication and is not to be unnecessarily expanded in application.

Solely because of their race, the petitioners here have been refused the use of city owned or operated parks and other recreational facilities which the Constitution mandates be open to their enjoyment on equal terms with white persons. The city has effected, continues to effect, and claims the right or need to prolong patently unconstitutional racial discriminations violative of now long-declared and well-established individual rights. The claims of the city to further delay in affording the petitioners that to which they are clearly and unquestionably entitled cannot be upheld except upon the most convincing and impressive demonstration by the city that such delay is manifestly compelled by constitutionally cognizable circumstances warranting the exercise of an appropriate equitable discretion by a court. In short, the city must sustain an extremely heavy burden of proof.

Examination of the facts of this case in light of the foregoing discussion discloses with singular clarity that this burden has not been sustained; indeed, it is patent

---

zoning of property, *e. g., City of Richmond* v. *Deans,* 281 U. S. 704; *Buchanan* v. *Warley,* 245 U. S. 60; or employment rights and union representation, *e. g., Brotherhood of Railroad Trainmen* v. *Howard,* 343 U. S. 768.

[5] This principle was well established even under the now discarded "separate but equal" doctrine. See, *e. g., McLaurin* v. *Oklahoma State Regents for Higher Education,* 339 U. S. 637, 642; *Sweatt* v. *Painter,* 339 U. S. 629, 635; *Sipuel* v. *Board of Regents of University*

from the record that the principles enunciated in the second *Brown* decision have absolutely no application here.

## III.

The findings of the District Court disclose an unmistakable and pervasive pattern of local segregation, which, in fact, the city makes no attempt to deny, but merely attempts to justify as necessary for the time being. Memphis owns 131 parks, all of which are operated by the Memphis Park Commission. Of these, only 25 were at the time of trial open to use without regard to race;[6] 58 were restricted to use by whites and 25 to use by Negroes; the remaining 23 parks were undeveloped raw land. Subject to exceptions, neighborhood parks were generally segregated according to the racial character of the area in which located. The City Park Commission also operates a number of additional recreational facilities, by far the largest share of which were found to be racially segregated. Though a zoo, an art gallery and certain boating and other facilities are now desegregated, about two-thirds (40) of the 61 city-owned playgrounds were at the time of trial reserved for whites only, and the remainder were set aside for Negro use. Thirty of the 56 playgrounds and other facilities operated by the municipal Park Commission on property owned by churches, private groups, or the School Board were set aside for the exclusive use of whites, while 26 were reserved for Negroes. All 12 of the municipal

---

of *Oklahoma*, 332 U. S. 631, 632–633. See also *Florida ex rel. Hawkins* v. *Board of Control*, 350 U. S. 413, 414, and notes 2 and 4, *supra*.

[6] These figures, and others referred to in the text, apparently represent the total extent of progress, as of the time of trial, toward desegregation of recreational facilities since this Court's decision eight years ago outlawing the practices here in question. So far as appears, none of the relevant facilities were open for use without regard to race prior to 1955, and, in fact, several new parks have been opened on a segregated basis since that time.

community centers were segregated, eight being available only to whites and four to Negroes. Only two of the seven city golf courses were open to Negroes; play on the remaining five was limited to whites. While several of these properties have been desegregated since the filing of suit, the general pattern of racial segregation in such public recreational facilities persists.[7]

The city asserted in the court below, and states here, that its good faith in attempting to comply with the requirements of the Constitution is not in issue, and contends that gradual desegregation on a facility-by-facility basis is necessary to prevent interracial disturbances, violence, riots, and community confusion and turmoil. The compelling answer to this contention is that constitutional rights may not be denied simply because of hostility to their assertion or exercise. See *Wright* v. *Georgia, ante,* p. 284; *Brown* v. *Board of Education,* 349 U. S. 294, 300. Cf. *Taylor* v. *Louisiana,* 370 U. S. 154. As declared in *Cooper* v. *Aaron,* 358 U. S. 1, 16, "law and order are not . . . to be preserved by depriving the Negro children of their constitutional rights." This is really no more than an application of a principle enunciated much earlier in *Buchanan* v. *Warley,* 245 U. S. 60, a case dealing with a somewhat different form of state-ordained segregation—enforced separation of Negroes and whites by neighborhood. A unanimous Court, in striking down the officially imposed pattern of racial segregation there in question, declared almost a half century ago:

> "It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the

---

[7] It is not entirely clear precisely how many properties have since trial actually been desegregated and how many were merely changed from "white-only" to "Negro-only" use in line with changes in neighborhood racial composition.

preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution." 245 U. S., at 81.

Beyond this, however, neither the asserted fears of violence and tumult nor the asserted inability to preserve the peace was demonstrated at trial to be anything more than personal speculations or vague disquietudes of city officials. There is no indication that there had been any violence or meaningful disturbances when other recreational facilities had been desegregated. In fact, the only evidence in the record was that such prior transitions had been peaceful.[8] The Chairman of the Memphis Park Commission indicated that the city had "been singularly blessed by the absence of turmoil up to this time on this race question"; notwithstanding the prior desegregation of numerous recreational facilities, the same witness could point as evidence of the unrest or turmoil which would assertedly occur upon complete desegregation of such facilities only to a number of anonymous letters and phone calls which he had received. The Memphis Chief of Police mentioned without further description some "troubles" at the time bus service was desegregated and referred to threatened violence in connection with a "sit-in" demonstration at a local store, but, beyond making general predictions, gave no concrete indication of any inability of authorities to maintain the peace. The only violence referred to at any park or recreational facility occurred in segregated parks and was not the product of attempts at desegregation. Moreover, there was no factual evidence to support the bare testimonial speculations that authorities would be unable to

---

[8] Nor, contrary to predictions, does it appear that violence or disruption of any kind ensued upon elimination of racial barriers to use of certain additional facilities subsequent to trial.

cope successfully with any problems which in fact might arise or to meet the need for additional protection should the occasion demand.

The existing and commendable goodwill between the races in Memphis, to which both the District Court and some of the witnesses at trial made express and emphatic reference as in some inexplicable fashion supporting the need for further delay, can best be preserved and extended by the observance and protection, not the denial, of the basic constitutional rights here asserted. The best guarantee of civil peace is adherence to, and respect for, the law.

The other justifications for delay urged by the city or relied upon by the courts below are no more substantial, either legally or practically. It was, for example, asserted that immediate desegregation of playgrounds and parks would deprive a number of children—both Negro and white—of recreational facilities; this contention was apparently based on the premise that a number of such facilities would have to be closed because of the inadequacy of the "present" park budget to provide additional "supervision" assumed to be necessary to operate unsegregated playgrounds. As already noted, however, there is no warrant in this record for assuming that such added supervision would, in fact, be required, much less that police and recreation personnel would be unavailable to meet such needs if they should arise.[9] More significantly, however, it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them. We will not assume that the citizens of Memphis accept the questionable premise implicit in this argument

---

[9] Except for the mention of some extra policemen assigned to duty at the city zoo, no showing was made even that additional supervision was necessary or provided at facilities which had been desegregated previously.

or that either the resources of the city are inadequate, or its government unresponsive, to the needs of all of its citizens.

In support of its judgment, the District Court also pointed out that the recreational facilities available for Negroes were roughly proportional to their number and therefore presumably adequate to meet their needs.[10] While the record does not clearly support this, no more need be said than that, even if true, it reflects an impermissible obeisance to the now thoroughly discredited doctrine of "separate but equal." The sufficiency of Negro facilities is beside the point; it is the segregation by race that is unconstitutional.

Finally, the District Court deferred ruling as to the propriety of ordering elimination of racial barriers at one facility, an art museum, pending initiation of, and decision in, a state court action to construe a racially restrictive covenant contained in the deed of the property to the city. Of course, the outcome of the state suit is irrelevant to whether the city may constitutionally enforce the segregation, regardless of the effect which desegregation may have on its title. Cf. *Pennsylvania v. Board of Trusts*, 353 U. S. 230. In any event, there is no reason to believe that the restrictive provision will be invoked. The museum has already been opened to Negroes one day a week without complaint.[11]

---

[10] Approximately 37% of Memphis' 500,000 residents are Negroes; contrary to the apparent assumption of the trial court, the recreational facilities available to Negroes were not at the time of trial all quantitatively proportional to their number and their complete or partial exclusion from certain other facilities evidenced a substantial qualitative difference. Moreover, there was testimony from Negro witnesses that they were excluded from golf courses and playgrounds more convenient to their places of residence than other like facilities open to them.

[11] The city also asserted in the District Court that delay was supported by the fact that desegregation of the Fairgrounds would result in a substantial loss of revenues therefrom and would be unfair to

Since the city has completely failed to demonstrate any compelling or convincing reason requiring further delay in implementing the constitutional proscription of segregation of publicly owned or operated recreational facilities, there is no cause whatsoever to depart from the generally operative and here clearly controlling principle that constitutional rights are to be promptly vindicated. The continued denial to petitioners of the use of city facilities solely because of their race is without warrant. Under the facts in this case, the District Court's undoubted discretion in the fashioning and timing of equitable relief was not called into play; rather, affirmative judicial action was required to vindicate plain and present constitutional rights. Today, no less than 50 years ago, the solution to the problems growing out of race relations "cannot be promoted by depriving citizens of their constitutional rights and privileges," *Buchanan* v. *Warley, supra,* 245 U. S., at 80–81.

The judgment below must be and is reversed and the cause is remanded for further proceedings consistent herewith.

*Reversed.*

---

contract concessionaires. This claim appears to have been mooted by the intervening elimination of racial restrictions at that facility, seemingly without difficulty.