**IRANIAN MUSLIM ORGANIZATION and Ali Seyed Fanai Khayat, Appellants,**

v.

**CITY OF SAN ANTONIO et al., Appellees.**

**No. 16468.**

Court of Civil Appeals of Texas, San Antonio.

July 23, 1980.

Louis F. Linden, Maury Maverick, Jr., Gerald Goldstein, Gen. Counsel, Texas Civil Liberties Union, Robert H. Ozer, Levey & Goldstein, San Antonio, for appellants.

Jane Macon, City Atty., Crawford Reeder, Patricia A. Mansell, Karen McHugh Vaughn, Asst. City Attys., San Antonio, for appellees.

OPINION

MURRAY, Justice.

This is an appeal from the denial of the appellants' application for a temporary mandatory injunction.

On December 2, 1979, approximately four weeks after the seizure of the American hostages in Tehran, Iran, Rezi Pahlavi, the former Shah of Iran, was flown from New York to Lackland Air Force Base in San Antonio, Texas. The next day the appellants filed two applications for parade permits for separate demonstrations to be held on December 7, 1979. One parade was to be held adjacent to Lackland Air Force Base at 11:00 a. m. The other demonstration was to occur in downtown San Antonio at 2:00 p. m.

The appellants desired to peacefully demonstrate against the Shah in the hope of convincing the American people that our government's support of the Shah is wrong. On December 4, 1979, the day after the

appellants filed their applications, an application for a parade permit was made on behalf of the Ku Klux Klan. The Klan sought to hold a demonstration at the same time and place as the appellants. That evening the City Manager announced at a news conference that the appellants' applications had been denied because the City had decided not to issue permits to any persons desiring to speak to the Iranian issue. The City Manager testified that the decision to deny the applications had been made only after consulting with numerous persons, including representatives of various law enforcement agencies, a staff person with the National Security Council, a diplomat with experience in Iranian affairs, and an employee of the Department of Justice. Although several reasons were given for the denial of the applications, the decision not to issue the permits was based entirely on a concern for the safety of the hostages. In other words, the City felt that there was a very real possibility that a demonstration would result in physical injury to the appellants, which in turn could have an adverse effect on the American hostages in Iran. The Acting Chief of Police of the City of San Antonio testified that had there been no hostages in Iran, the permits would have been issued.

On December 10, appellant, Ali, and four of his friends began a hunger strike on the steps of City Hall. The demonstration lasted until December 12 when the five Iranians were arrested and taken to jail. At the time of the arrest a mob of approximately 300 persons had gathered at City Hall at the urging of two radio personalities. The mob had been taunting the demonstrators and were threatening to use force to remove them from the steps of City Hall. The Acting Chief of Police testified that the demonstrators were arrested because it was the only means of protecting them from the unruly mob.

On December 11, the San Antonio City Council heard the appellants' appeal of the City Manager's decision. At the conclusion of the hearing a motion was passed which states in pertinent part, "I move the Council uphold the Manager's decision and that permits be denied for public parades and or demonstrations to the Iranian Muslim Student Association and others who encompass the cause either pro or con in the Iranian question."

Subsequently, the appellants filed this suit to permanently enjoin the City from interfering with their rights of free speech and assembly. The appellants also sought a temporary injunction ordering the appellees to grant a parade permit for a demonstration to be held within three days of the issuance of the preliminary order. From an order denying the appellants' application for a temporary injunction, an appeal has been perfected.

When reviewing a trial court's order granting or denying a temporary injunction, the only question before the appellate court is whether the action of the trial judge in granting or denying the temporary injunction constitutes a clear abuse of discretion. In making its determination, the court may not assume that the evidence developed at the preliminary hearing will be the same as that adduced at a full trial on the merits. *See Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex.1978). Moreover, the issuance of a preliminary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *See Gunnels v. North Woodland Hills Community Association*, 563 S.W.2d 334, 337 (Tex.Civ.App.— Houston [1st Dist.] 1978, no writ); *City Council of Fort Worth v. Fort Worth Associated Master Plumbers & Heating Contractors, Inc.*, 8 S.W.2d 730, 734 (Tex.Civ.App.— Fort Worth 1928, writ ref'd). The appellants allege that the Shah's stay in San Antonio is a temporary one, and that the purpose of having a demonstration is to protest the presence of the Shah in this country and, specifically, in San Antonio, Texas. Thus, it is contended that immediate relief is necessary to avoid the irreparable injury that would occur if the appellants were not allowed to demonstrate while the Shah was in San Antonio. At the time of the hearing on the application for a tempo-

rary injunction, however, the Shah had departed the United States and was residing in Panama. Since no findings of fact or conclusions of law were requested or filed, the trial court's judgment must be upheld on any legal theory supported by the record. *See Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). We conclude that there is some basis upon which the trial court could have properly held that a mandatory order was not necessary to prevent irreparable injury. Accordingly, we hold that the trial court did not abuse its discretion in determining that the appellants were not entitled to a temporary mandatory injunction pending the final hearing.

The judgment of the trial court is affirmed.

CADENA, Chief Justice.

I cannot agree that doctrines concerning the broad discretion vested in a trial judge in temporary injunction proceedings and the limited scope of appellate review in such cases furnish a foundation strong enough to support the heavy weight of the attempt by the City of San Antonio to impose prior restraints on public discussion of questions raised on connection with our past and future relations with, and policy toward, Iran.

Although questions concerning the rights of public protestors have often faced the courts of this country, it is difficult to identify concrete standards which furnish reliable guidance in cases involving prior restraints on the right to demonstrate. But, as Mr. Chief Justice Burger pointed out in 1976, at that time every member of the Supreme Court of the United States had accepted, tacitly or expressly, the principle that prior restraints on expression are presumptively unconstitutional. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 558, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683 (1976). Since the presumption against the validity of prior restraints is a " 'heavy presumption,' " *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968), the City of San Antonio in this case "carries

a heavy burden of showing justification for the imposition of [the prior] restraint." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). Even if we accord to the trial court the broadest constitutionally permissible discretion in this case, it cannot reasonably be concluded that the City has discharged its "heavy burden."

Several persons spoke at the City Council meeting which resulted in the adoption of the resolution confirming the decision of the City Manager to ban all parades or demonstrations which had as their purposes the airing of views concerning the "Iranian question."

Several persons predicted the outbreak of violence if appellants were allowed to parade or demonstrate. Others argued that appellants, being foreigners, had no constitutional rights. The City Manager told the Council that his decision had been made only after discussion with "appropriate City departments and other sources," and that his prime concern was the effect that action taken in San Antonio might have on the well–being of the hostages in Iran. He then said he denied the permit because (1) the holding of the parade would divert so much police manpower that the City would be unable to furnish normal police protection throughout the municipality; (2) the "request contained a high potential for violence, disorderly conduct and disturbance"; (3) a parade "would disrupt the safe and orderly flow of traffic in and around the area of the parade and/or demonstration"; (4) "there was a high degree of probability that the parade could not progress without unreasonable delay"; and (5) the permit "was not, in fact, requested fifteen days in advance, as required by the ordinance."

One of the speakers pointed out that there had been "a number of acts done in the United States by various people and by the United States government which are substantially more likely to provoke reprisals—amongst the ones I would say are the freezing of all Iranian assets in the United States; the announcement of an economic—a potential economic embargo against

Iran; and indeed, the death of several Iranian students throughout the country in the last week and a half." Nevertheless, he said, there had been no reprisals against the hostages, "nor have we had any intimation from whatsoever anyone," other than city officials, "that such reprisals might indeed happen."

The City's answer to appellants' petition alleged only the "unacceptable potential for danger to the hostages now being held in" Iran and "the volatile emotional atmosphere in the City which portends disruption of public order with consequent injury to [appellants] and others." The other five reasons given by the City Manager for refusing the permit were not mentioned in the answer as justifying the prior restraint.

The "evidence" summarized in the majority opinion came from witnesses whose backgrounds give rise to no indication that they possess any expertise in dealing with problems which require predictions concerning reactions of foreign governments to events which take place in this country. Part of the testimony was no more than statements concerning what one witness had been told by others and there is no more than a scintilla of evidence suggesting that the declarants to whom the witnesses referred had any knowledge concerning possible reactions of the revolutionaries in Iran. Many of the witnesses candidly acknowledged their lack of expertise.

No further attempt need be made to summarize the statements of the witnesses, other than to point out that all of the testimony related only to possibilities. For example, one of the witnesses testified that if the parade were held the Iranian students "possibly" might suffer personal injury, and that if such injury occurred "[t]here is always that possibility" that Iranian officials might retaliate against the hostages. The nature of the testimony on which the City relies and on which the trial court presumably based its conclusions was aptly described by the trial judge when, in answer to the objection that the testimony of a witness consisted of sheer guesswork, said: "I'm sure that's all it was, was a guess. That's all everybody is doing here, is guessing, except the Court." The record furnishes no information helpful in interpreting the trial judge's remark that he was the only one who was not guessing.

Obviously, even the most informed witnesses are unlikely to have all the information needed in order to predict accurately how events in San Antonio will affect the actions of a foreign government or of a mob in a foreign country. The effect in Iran of a demonstration by Iranians in this country resulting in physical harm to the demonstrators cannot be predicated with certainty because of the complex chain of causation involved. But to hold that the guesses of uninformed witnesses in this case is sufficient to overcome the heavy presumption against the constitutionality of a previous restraint would significantly lower the barriers against prior restraints and substantially weaken the presumption against the validity of such restraints.

The testimony in this case can profitably be compared with the testimony in *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam), which involved an attempt by the United States to prevent the publication of the "Pentagon Papers," secret documents which had been stolen from the United States Government. In *Times* the testimony concerning the serious threat to the security of this nation which would result from the publication of such documents consisted of the opinions of "high officers in the Executive Branch of the Government," the branch of the government to which the United States Constitution has confided the delicate and complex problems of foreign policy and of negotiating with other countries. 403 U.S. at 754, 91 S.Ct. at 2161 (Harlan, J., dissenting). That is, the testimony came from officials responsible for the formulation and implementation of the foreign and defense policies of the United States and who could reasonably be expected, because of the nature of their responsibilities, to possess knowledge, not available to others, concerning the relations between this country and its allies, the state of the

negotiations with the government of North Vietnam relating to the termination of the Vietnam conflict, the possibility of diplomatic solution to problems related to that conflict, and the political, military and economic pressures on North Vietnam to negotiate.[1] The testimony and the nature of the documents was of such a nature that Mr. Justice Blackmun, in dissent, concluded that publication of the documents would clearly result " 'in great harm to the nation,' " including "the death of soldiers, the destruction of alliances, the greatly increased difficulty of negotiation with our enemies, the inability of our diplomats to negotiate . . [the] prolongation of the war and . . . . further delay in the freeing of United States prisoners . . . ." 403 U.S. at 762–63, 91 S.Ct. at 2165–66. Mr. Justice White and Mr. Justice Stewart, two members of the majority which held that the banning of publication would be unconstitutional, were personally convinced that publication would work substantial harm to the national interest but they nevertheless ruled against the validity of the previous restraint which the United States sought to impose. 403 U.S. at 730–31, 91 S.Ct. at 2149.

Mr. Justice Stewart, joined by Mr. Justice White, stated that a prior restraint may be imposed on publication only when the government proves that such publication would "surely result in direct, immediate, and irreparable damage to our Nation or its people." 403 U.S. at 730, 91 S.Ct. at 2149. The concurring opinions of Justices Black, Douglas and Brennan support the conclusion that these three members of the Court, along with Mr. Justice White, would concur in the application of the standard described in the Stewart opinion.

*Times* compels the conclusion that the testimony relied on by the City in this case falls far short of the standard to be applied in prior restraint cases.

With respect to the fear that the demonstration by appellants would attract a hostile audience and result in violence, it must be borne in mind that, unlike the situation in *Feiner v. New York*, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), we do not have before us a case in which, while the demonstration was in progress, a hostile audience was actually present and threatening immediate harm to the demonstrators. The observation in *Feiner* that the speaker had passed "the bounds of argument and persuasion and [had undertaken] incitement to riot" is, of course, inapplicable to this case. Another significant distinction is that *Feiner* did not involve a prior restraint.

The problem of a hostile audience has been presented to the Supreme Court of the United States in only a handful of cases in addition to *Feiner*. It is possible to find sweeping assertions that "constitutional rights may not be denied simply because of hostility to their assertion or exercise," *Watson v. City of Memphis*, 373 U.S. 526, 535, 83 S.Ct. 1314, 1319, 10 L.Ed.2d 529, 536 (1963), and that it is firmly settled that "under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of the hearers," *Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 576, 585 (1969); *Bachellar v. Maryland*, 397 U.S. 564, 567, 90 S.Ct. 1312, 1314, 25 L.Ed.2d 570, 574 (1970). *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), may, perhaps, be cited in support of the view that the possibility of riot is not sufficient justification for the imposition of a prior restraint since the Court in that case held facially invalid an ordinance which permitted the denial of a permit only when the denial was "for the purpose of preventing riots, disturbances or disorderly assemblage." 307 U.S. at 502 n. 1, 59 S.Ct. at 958, 83 L.Ed. at 1429. However, the validity of such conclusion is considerably weakened by the fact that only three of the justices who made up the five–member majority joined in the opinion discussing the problem of a hostile audience.

---

1. The testimony relied on by the Government came from four high officials in the Departments of State and Defense. *The Supreme* *Court*, 1970 Term, 85 Harv.L.Rev. 3, 201 n. 12 (1971).

*Gregory v. City of Chicago*, 394 U.S. 111; 89 S.Ct. 946, 22 L.Ed.2d 134 (1969), involved a conviction for disorderly conduct rather than the validity of a prior restraint. It involved the picketing of the home of the mayor of Chicago by 85 well–behaved persons. Policemen were making every effort to protect the protestors but after about an hour the protestors were belted by eggs, rocks and bottles hurled by some members of a crowd of 2,000 hecklers. Because of the size of the crowd, the guilty persons were able to get lost in the crowd escaping identification and apprehension by police. The police asked the leader of the protestors to disband his followers and arrested him for disorderly conduct when he refused. In affirming the conviction, the Supreme Court of Illinois limited its holding to a situation where there is an imminent threat of violence and the police request that the demonstration be stopped, accompanied by an explanation of the request, has met with refusal. *Chicago v. Gregory*, 39 Ill.2d 47, 233 N.E.2d 422, 429 (1968).

The Supreme Court of the United States reversed the conviction. Unfortunately, the opinion consisted of only four paragraphs. At one place the Court said that the demonstration, "if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." 394 U.S. at 112, 89 S.Ct. at 947, 22 L.Ed.2d at 136. The Court also said that the record contained no evidence supporting the conclusion that the demonstrators were guilty of disorderly conduct. This statement is not easily understood because the evidence clearly supported a finding of the existence of all elements of the offense of disorderly conduct as that offense was defined by the Supreme Court of Illinois. But this reference to a lack of evidence makes it somewhat difficult to categorically interpret *Gregory* as holding that the presence of a hostile mob does not justify the suppression of free speech even where, as there, the suppression was not in the form of a prior restraint.

Even if it be assumed that an uncontrollable hostile mob justifies some restraints on freedom of expression, such an assumption is inapplicable in cases such as those involving the denial of a permit, where the hostile audience is not an ongoing present actuality but merely a threat. Ignoring the possibility that the threat is exaggerated by unreasonably apprehensive municipal officials, the threat may not materialize, particularly if city officials forthrightly make it clear that the exercise of constitutional rights will be protected. "Thus, at the permit application stage, the choice need not be between legalized vigilantism and bloodbath, since the advance notice gives the city an adequate opportunity to protect the demonstrators—if necessary by requesting the governor to call out the National Guard, which, after all, ought to be employed as readily to protect human beings exercising their constitutional rights as it is to protect merchandise." Blasi, *Prior Restraints on Demonstrations*, 68 Mich.L.Rev. 1482, 1514 (1970).

To many, perhaps, the notion of extraordinary protective efforts to insure the safe exercise of constitutional rights is ludicrous in a situation where the protection is extended so that the person protected may present unpopular views. But, at the very least, the protection of constitutional rights should merit more than the supine capitulation to vigilantism which is reflected by the record before us.

The fear of violence to the Iranian protestors arose primarily from the fact that the Ku Klux Klan, one day after appellants applied for a permit, sought a permit to parade and demonstrate at the same time and place. This conflict of requests apparently so paralyzed municipal officials that they made no effort to solve the problem other than imposing the prior restraint of which appellants now complain. No effort was made to persuade the two applicants to demonstrate at the same time at geographically separate locations, or to demonstrate at the same place at different times. We are unable to determine from the record before us whether it was the policy of the City of San Antonio to respond to conflicting requests for permits by simply denying all such requests. No effort was made to

consult with other law enforcement agencies in the county concerning the availability of manpower to protect appellants. There is no evidence that any municipal official attempted to make it clear to the Ku Klux Klan that the rights of appellants would be protected. Apparently it did not occur to municipal officials that off–duty City policemen could be called to protect the paraders, although the request allowed the City several days to overcome the difficulty, apparently deemed insurmountable, of arranging for such protection. Bluntly stated, City officials gave no consideration to any alternative other than the stifling of expression.

The prior restraint in this case can be upheld only by accepting the principle that suppression of the rights of free speech and free assembly can be made an easy and acceptable substitute for the performance by municipal officials of their duty to maintain order by taking such steps as may be reasonably necessary and feasible to protect peaceable, orderly speakers, marchers or protestors against the threats of violence or disorderly retaliation or illegal attack by those who may disagree and object. There may be valid reasons for rejecting the principle, implicitly in the holdings of some lower federal courts, that the fear of a hostile audience is never to be considered in ruling upon applications for permits. *See, e. g., Stacy v. Williams*, 306 F.Supp. 963 (W.D.Miss.1969); *Williams v. Wallace*, 240 F.Supp. 100 (N.D.Ala.1965). But neither these reasons nor other pragmatic considerations can justify acceptance of the notion that city officials fulfill their obligations by surrendering to those who would impose their views on others by suppressing all dissent.