TENNESSEE SMALL SCHOOL
SYSTEMS, et al., Plaintiffs–
Appellants,

v.

Ned Ray McWHERTER, et al.,
Defendants–Appellees,

Charles O. Frazier, Director of Metropolitan Nashville, Davidson County Public Schools, et al., Defendants–Intervenors/Appellees.

Supreme Court of Tennessee.

Feb. 16, 1995.

Lewis R. Donelson, Phillip S. McSween, H. Buckley Cole (Heiskell, Donelson, Bearman, Adams, Williams & Caldwell, of counsel), Nashville, for appellants.

Charles W. Burson, Atty. Gen. & Reporter, Michael E. Moore, Sol. Gen., Michael Catalano, Associate Sol. Gen., Rachel L. Steele, Asst. Atty. Gen., Nashville, for defendants-appellees.

Ernest G. Kelly, Jr., Memphis, for defendants-intervenors.

## OPINION

REID, Justice.

This second appeal presents for review the decision of the chancery court denying the plaintiffs' demand that funding for all local school systems be equalized immediately. The judgment of the trial court is modified, and the case is remanded.

### PRIOR PROCEEDINGS

In *Tennessee Small School · Systems v. McWherter*, 851 S.W.2d 139, 151 (Tenn.1993), this Court held that the Tennessee Constitution guarantees to the school children of this State the right to a free public education and imposes upon the General Assembly the obligation to maintain and support a system of free public schools that affords substantially equal educational opportunities to all students. The Court found that there existed constitutionally impermissible disparities in educational opportunities available to public

school students throughout the State, and that those disparities had been caused principally by the State's statutory funding scheme. The Court held that the funding scheme violated the constitutional guarantee of equal protection of the law. *Id.* at 156. However, rather than fashion a remedy for the constitutional deficiency, the Court deferred to the legislature the opportunity to establish a public school system that would afford substantially equal educational opportunities to the public school students throughout the State. The opinion was released on March 22, 1993.

In 1991 while this case was pending in the chancery court, the Basic Education Program (BEP), which the defendants insist eliminates the constitutional deficiencies, and a proposal to fully fund the BEP were submitted to the legislature. Included in the 1991 version of the BEP was an allocation of $565 million for the purpose of equalizing the funding of local school systems. However, both the BEP and the funding proposal were rejected by the legislature. In fact, the legislature reduced substantially the funding for education at the 1991 session.

In July of 1991, following the adjournment of the legislature, the chancellor found the State educational system to be unconstitutional, but delayed the effective date of the order until June 30, 1992, obviously allowing the legislature an opportunity to correct the constitutional deficiencies.

At a special session of the legislature in January, 1992, called by the Governor for the purpose of dealing with education issues, a proposal to enact the BEP fully funded was again rejected by the legislature.

While the case was pending in this Court, the legislature, at the regular 1992 session, enacted the Educational Improvement Act of 1992. That Act incorporated the BEP, with significant amendments affecting teacher salary increases and funding. Legislation adopting the BEP provided that full funding be phased in, beginning with the 1992–93 fiscal year and ending with appropriations for the fiscal year beginning July 1, 1997.

Acts 1992, chapter 481, Tenn.Code Ann. § 49–3–354(i).

### THE ISSUES

The plaintiffs contend that the statutory funding scheme enacted violates the equal protection provisions of the constitution because complete equalization is accomplished over a period of years rather than immediately, and because the plan contains no provision for equalizing teachers' salaries.

The plaintiffs rely upon the principle that the violation of constitutional rights must be corrected with all deliberate speed,[1] and they insist that incremental equalization of funding is not compliance with that constitutional mandate and is not permitted by the prior decision of the Court in this case. They maintain that legislative prerogative applies to the means of establishing a constitutional system, not the time within which that objective must be accomplished. They contend that, since the State does not claim there is any absolute obstacle to equalizing the funding of all local systems, immediate equalization is required. They further contend that the failure to require the equalization of teachers' salaries and the failure to provide "catch-up" funds for capital improvements will perpetuate constitutional disparities.

The defendants defend the incremental equalization as being constitutional and responsible. They argue that teachers' salaries do not affect quality of instruction or educational opportunity. They insist that immediate equalization of funding, including that for capital improvements, would not equalize educational opportunities, which is the constitutional mandate.

Resolution of the issues presented requires an examination of the education program contained in the BEP and the provisions for the equalization of funding.

### THE BASIC EDUCATION PROGRAM (BEP)

The funding scheme that caused the constitutionally impermissible disparities in edu-

---

1. The primary case relied upon by the plaintiffs on this issue is *Watson v. City of Memphis*, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963), pertaining to the desegregation of Memphis's city parks and recreation facilities.

cational opportunities was the Tennessee Foundation Program (TFP) augmented by categorical grants from the State to local school systems. Funding under that program, which included only a token amount for equalization of the local systems, was not related to the costs of providing programs and services by the several local school systems. State funding for the local systems was based primarily on average daily attendance of students. Local funding depended upon local sales tax collections and discretionary appropriations by local governments. The TFP was principally a state-ordered program with little managerial discretion at the local level.

The BEP is quite different from the TFP in concept. It is designed to provide, when fully funded, the programs and services essential to a basic education for public school children in grades K through 12 throughout the State. That objective is to be accomplished by defining the essentials of an effective education plan suitable for every local system and implementing that plan through organizational structure, disciplined management and adequate funding.

Under the BEP, the appropriation and distribution of funds are determined by the cost of a program necessary to provide an adequate basic education for the students in all local systems throughout the State. The total funds necessary to fully fund the BEP is substantially greater than that made available under the TFP. Using fiscal year 1990–91 as a base, additional funds are provided to each local system each year in order to improve its education program and also to reduce existing disparities in funding among the local systems.

The BEP, as enacted, provides for the allocation of funds to each local school system based on the costs of 42 "components" found by the State Board of Education to be needed by all local systems. Included among the 42 components are basic, vocational, and special education; guidance counseling; textbooks; art, music, and physical education; services of librarians, social workers, and psychologists; computer technology; supervisory and administrative staffs; transportation; and capital expenditures for physical

facilities. The allocation formula uses average daily membership of students rather than average daily attendance. The BEP limits the ratio of students to teachers and other personnel and also to support functions and facilities.

The formula whereby the component parts of the program are determined is reviewed annually by a BEP review board, which includes the Commissioner of Education, the Commissioner of Finance and Administration, representatives of various local school systems, representatives of professional education organizations, and other members designated by the State Board of Education. After review by the Board of Education, the BEP formula may be adjusted to reflect changes whereby the system can be improved. However, the components of the plan approved by the Board of Education for fiscal year 1992–93 cannot be changed without the approval of the Commissioner of Education and the Commissioner of Finance and Administration, and the revised formula must be approved by resolutions of the Senate and House of Representatives before any change can become effective.

The actual cost of each component of the BEP for each local school system is determined annually, according to a formula which reflects the variations in the costs of providing programs and services throughout the State. Tenn.Code Ann. § 49–3–351(a). The total cost of the BEP for each local system is the sum of the costs of the 42 components. The total cost of the BEP is, of course, the total costs of all local systems.

This cost, the actual cost of providing the programs and services embodied in the BEP, determines the funding to be provided by the State and the minimum funding to be provided by local governments each fiscal year.

The significant provisions of the BEP other than funding are characterized as governance and accountability measures. These reforms are designed to address "the relative indifference" to education demonstrated by some local systems, which this Court found to be a contributing factor to the inequities in educational opportunities. *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d at 156.

The BEP purports to accomplish these objectives by granting to local officials more discretion in the management of the system and holding those officials accountable for obtaining measurable accomplishments in providing an effective educational system.

Each local system is required to develop a long-range plan, including goals and strategies, and distribute annually a report that shows the results of the system's management. Performance by each local system is monitored by State officials. Any local system that fails to achieve the objective standards set forth in the plan may be "placed on probation" by the Commissioner of Education with the approval of the State Board of Education. Tenn.Code Ann. § 49–1–602. During the first year of probation, the State Department of Education is required to make a comprehensive study of the local system and make recommendations on how the system can improve its performance and meet the applicable standards. After two consecutive years on probation, some or all of the members of the local board of education and/or the superintendent may be removed from office by the Commissioner of Education with the approval of the State Board of Education. The statute provides for the selection of their successors.

The BEP requires state and local funding, but the amount of funds collected or appropriated by a local government does not affect the funding provided to that local school system under the BEP. The 42 components of the BEP are divided into two categories, classroom components and system support components. The State is obligated to fund 75 percent of the cost of the classroom components and 50 percent of the system support components, and the local systems collectively must provide 25 percent of the cost of the classroom components and 50 percent of the system support components. A proportionate share of the total cost of the BEP is assigned to each local system based on its county's relative ability to pay, its "fiscal capacity." Fiscal capacity is calculated by using a methodology developed by the Tennessee Advisory Commission on Intergovernmental Relations. Each county's fiscal capacity is calculated as a percentage of the total capacity of all counties in the State. The capacity calculations are based on sales tax base, property tax base and income. Each local government is required by statute to appropriate the funds determined to be its share.

## EQUALIZATION UNDER THE BEP

Equalization under the BEP will be completed according to the five-year funding plan adopted in 1992. It utilizes as a base the amount of funds distributed by the State to each local system in fiscal year 1990–91. The TFP funding scheme is used for no purpose other than identifying the base amount. No school system will receive annually an amount less than its base amount. The difference between the base amount and the total cost of the BEP fully funded is the determinative factor in the equalization formula. Annual funding in excess of the base amount is distributed among the local systems on a pro rata basis according to the difference between each local system's base amount and the amount that local system would receive if the BEP were fully funded. Tenn.Code Ann. § 49–3–354(e). During the transition period, the local system that has the greatest difference between its base and its entitlement under the BEP fully funded, will receive the greatest percentage increase in funding. Conversely, the system that has the least difference between its base and its entitlement will receive the least percentage increase in funding.

In addition to the funding for the 42 components of the BEP provided by the State and by local systems, the State provides a "growth fund" to systems experiencing growth in enrollment of two percent or more during a school year, funding for an information management computer system connecting all schools in a local system to the central office and all central offices to the office of the State Department of Education in Nashville, and additional funding for the technology component. Although these three items are outside of the basic plan of 42 components, the funding is allocated according to the BEP incremental equalizing formula.

## EXCLUSION OF TEACHERS' SALARIES FROM EQUALIZATION

Funding based on determined costs is mandated for each component of the basic education plan except teachers' salaries. The allocation for teachers' salaries to each local system is the product of the amount of the system's average teacher salary, based on the State salary schedule plus the mandated local supplement, multiplied by the number of BEP teacher positions in that local system. Local systems are allowed to use classroom funds for any of the classroom components and they are allowed to use system support funds for any of the system support components. However, they are prohibited from using BEP funds for the purpose of increasing teachers' salaries. Since the adoption of the BEP, teachers have received the same increases in salaries as other State employees, except the total amount paid teachers has been distributed according to the BEP formula. However, there is no provision in the BEP for increasing teachers' salaries or equalizing teachers' salaries.

The State's explanation, and justification, for this treatment of the funding of teachers' salary increases is that historically all funds made available to local systems have been applied to teachers' salaries, resulting in other needs being neglected. The State takes the position in this case that increasing and equalizing teachers' salaries is *not* a component of a basic education, that it "does not affect student performance." The argument is dramatically weakened by the inclusion of this item in earlier BEP proposals.

The decision by the architects of the BEP to prohibit the use of classroom funds and system support funds to increase teachers' salaries does not require that funds for teachers' salary increases be excluded from the plan. Obviously, it can be a separate category of funding, along with classroom components and support system components.

The omission of a requirement for equalizing teachers' salaries is a significant defect in the BEP. The rationale supporting the in-

clusion of the other important factors constituting the plan is equally applicable to the inclusion of teachers' salaries. Teachers, obviously, are the most important component of any education plan or system, and compensation is, at least, a significant factor determining a teacher's place of employment. The costs of teachers' compensation and benefits is the major item in every education budget. The failure to provide for the equalization of teachers' salaries according to the BEP formula, puts the entire plan at risk functionally and, therefore, legally.

## CONCLUSION

■■■ The Court accepts the State's insistence that substantial improvement in educational opportunities throughout the State under the BEP can best be accomplished incrementally and only if complete equalization of funding is accomplished incrementally also. The Court finds, however, that exclusion of teachers' salary increases from the equalization formula is of such magnitude that it would substantially impair the objectives of the plan; consequently, the plan must include equalization of teachers' salaries according to the BEP formula. The record does not support the plaintiffs' contention that funding for capital improvements should be given priority over other needs. The plan, as modified, is approved for the purposes of this proceeding.

It appears that the BEP addresses both constitutional mandates imposed upon the State—the obligation to maintain and support a system of free public schools and the obligation that that system afford substantially equal educational opportunities.[2]

The BEP is designed to accomplish two significant objectives—provide an excellent education program for all K thru 12 students throughout the State and provide substantially equal educational opportunities for those students. Under the BEP, neither objective will be accomplished immediately, but both objectives are scheduled to be accomplished no later than fiscal year 1997–98. Adequate

---

**2.** Article 11, Section 12; Article 1, Section 8; and Article 11, Section 8 of the Tennessee Consti-   tution.

funding is essential to the development of an excellent education program, and immediate equalization of funding would not necessarily insure immediate equalization of educational opportunities or a more excellent program.

The essentials of the provision of the plan relating to funding are that funding determined by the costs of implementing the BEP will be provided in full beginning with fiscal year 1997–98; and that, prior to that time, an increased amount of funding will be made available to each local system each year according to the equalization formula set forth in the plan, which favors those systems in greater need of additional resources. The essentials of the governance provisions of the BEP are mandatory performance standards; local management within established principles; performance audits that objectively measure results; public disclosure by each local system of objectives, strategies, and results; removal from office of local officials unwilling or unable to effectively manage a local system; and final responsibility upon the State officials for an effective educational system throughout the State. Each of these factors relating to funding and governance is an integral part of the plan and each is indispensable to its success. Consequently, none of the factors can be compromised without destroying the integrity and effectiveness of the plan.

The source of funding for the plan addresses the discretion of the legislature. The Court's approval of the plan, as modified, as a means to accomplish the constitutional mandate is not conditioned upon any particular source of revenue. The inadequacy of particular sources of revenue would not justify modification of the education program or the funding schedule.

The cause is remanded to the chancery court for such proceedings as may be appropriate.

Costs are taxed to the State.

ANDERSON, C.J., and DROWOTA, O'BRIEN and BIRCH, JJ., concur.