Manion, Circuit Judge, dissenting.
In District of Columbia v.Heller , 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held our Constitution ensures "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Shortly thereafter, this court logically extended the Supreme Court's holding to include "a right to carry a loaded gun outside the home." Moore v. Madigan , 702 F.3d 933, 936 (7th Cir. 2012).
Nevertheless, the court today upholds Illinois's scheme that categorically prohibits the citizens of 45 states from fully exercising this right when they find themselves within Illinois's borders. Because Illinois has failed to adequately justify this significant curtailment of individual liberty, I dissent.[1]
I.
In the wake of our decision in Moore , Illinois passed the Firearm Concealed Carry Act (FCCA), allowing those whom Illinois licenses to carry concealed firearms in public for self-defense. As the court notes, Illinois allows nonresidents without an Illinois license to bring firearms into the state in very limited circumstances. For instance, nonresidents with a concealed-carry license from their own state may "travel with a firearm in their vehicle," and anyone entitled to possess a firearm in their own state may "possess a firearm ... on their own premises or in the home of an Illinois resident with permission, while hunting, and while engaging in target practice at a firing or shooting range." Maj. Op. at 652 (citations omitted). But licensed concealed carry remains the only legal way to bear a firearm in public in Illinois, see 720 ILCS 5/24-1.6(a) (defining the crime of "Aggravated unlawful use of a weapon" to include the open carry of a firearm), and Illinois unconditionally denies that ability to the residents of 45 states.
It does so by only accepting applications for concealed-carry licenses from nonresidents who reside in states it determines have "laws related to firearm ownership, possession, and carrying, that are substantially similar to the requirements to obtain a license under [the FCCA]." 430 ILCS 66/40(b). The Illinois Department of Police decides which states are "substantially similar." See id. ; ILL. ADMIN. CODE tit. 20 § 1231.110(c). To determine which states qualified, the Department sent surveys to the states in 2013. Based on the responses, the Department concluded Hawaii, New Mexico, South Carolina, and Virginia were "substantially similar." In 2015, the Department sent another round of surveys. Hawaii, New Mexico, and South Carolina changed their answers, so the Department took them off the list. But the Department added Arkansas, Mississippi, and Texas. That is the last survey of which we have evidence.[2]
Therefore, as it stands, only the residents of Arkansas, Mississippi, Texas, and Virginia may even apply for a nonresident concealed-carry license. This means Illinois categorically denies the residents of the *660 remaining 45 states the ability to exercise the fundamental right to carry a firearm in public in Illinois simply because of the "ineligible" state in which they reside. Such a regime cannot withstand dutiful judicial scrutiny.
II.
As I explained in my dissent the last time this case was before this court, there is no doubt the FCCA must face "exacting (although not quite strict) scrutiny." Culp v. Madigan , 840 F.3d 400, 407 (7th Cir. 2016) (Manion, J., dissenting). Illinois must show "an extremely strong public-interest justification and a close fit between the government's means and its end." Id. at 404 (quoting Ezell v. City of Chicago , 651 F.3d 684, 708 (7th Cir. 2011) ). I concluded Illinois did not do so at the preliminary injunction stage, and nothing has changed since then.
Illinois's proffered goal for its law-to keep guns out of the hands of felons and the mentally ill in public-assumedly satisfies the "extremely strong public-interest justification" prong of the test.[3] The question is whether Illinois's licensing scheme that prevents law-abiding, healthy citizens from even applying for a concealed license is sufficiently tailored to that goal. Certainly, if Illinois is going to have a licensing regime, it has to have some method of ensuring the individuals it licenses are eligible and remain so. However, Illinois has utterly failed to show that banning the residents of an overwhelming majority of the country from even applying for a license is a "close fit" to its goal.
Most importantly, and as I pointed out before, the system is grossly underinclusive and overinclusive. An Illinois resident holding a license could cross the Mississippi River to Missouri, check himself into a mental-health clinic, and then return without Illinois ever knowing. Or a person could live in one or more of the 45 dissimilar states for years and then move to a similar state, automatically becoming eligible to apply for a license even though "Illinois (and, presumably, the substantially similar state as well) [would be] unable to obtain information about his possible criminal or mental problems in those states." Culp , 840 F.3d at 403 (majority opinion). But a colonel in the United States Air Force licensed as a concealed-carry instructor in Illinois cannot apply for a concealed-carry license of his own because he is a resident of Pennsylvania. Courts should not allow such slipshod laws to proscribe the exercise of enumerated rights. See id. at 408 (Manion, J., dissenting) (citing Ark. Writers' Project, Inc. v. Ragland , 481 U.S. 221, 232, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) ).
Illinois asks the court to ignore these problems because of presumed administrative difficulties. If it is not allowed to restrict the application process to residents of certain states, it contends, it will have no way of concluding the residents of dissimilar states are eligible for a license and continue to be so for the term of the license. Illinois's main objection to allowing applications from anyone is that if an applicant's state does not report certain information *661 to national databases, Illinois would have to obtain the information some other way, and that would be too burdensome.
To start with, "the Constitution recognizes higher values than speed and efficiency"; simply avoiding cost and administrative burden does not justify denying constitutional rights. Stanley v. Illinois , 405 U.S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ; see also Watson v. City of Memphis , 373 U.S. 526, 537, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them."); Culp , 840 F.3d at 407 ("[T]he tailoring requirement prevents [the] government from striking the wrong balance between efficiency and the exercise of an enumerated constitutional right.").
Furthermore, there is no evidence in the record that Illinois could not pursue its goal in a more targeted way that would respect the fundamental right at stake. Perhaps Illinois could pass the costs on to the applicant-it already charges nonresidents twice as much when they apply. See 430 ILCS 66/60 (imposing $150 fee for residents and $300 fee for nonresidents). Or Illinois could place the burden on applicants themselves to contact appropriate authorities and acquire the information Illinois demands, and it could require the information be transmitted in some form with sufficient indicia of authenticity.
Similar workarounds could be found for mental-health records, even though some states do not track mental-health information. Illinois already requires every applicant for a concealed-carry license to provide Illinois with the ability to access the applicant's private information. See 430 ILCS 66/30(b)(3) (listing among the contents of an application "a waiver of the applicant's privacy and confidentiality rights and privileges under all federal and state laws, including those limiting access to ... psychiatric records or records relating to any institutionalization of the applicant"). So, to the extent any mental-health records are kept by the authorities, Illinois could access them (or, again, put the cost and time burden on the applicant to access them and provide certified versions to Illinois). In the case of voluntary mental-health admissions that are particularly likely not to be tracked, Illinois could have every applicant from a dissimilar state conform to the certification procedure already found in Illinois law, which allows those who have been voluntarily treated in the past to obtain a certification of health from "a physician, clinical psychologist, or qualified examiner." See 430 ILCS 65/8(u). Indeed, "such certification would provide Illinois with more information than it can obtain about its own residents' out-of-state sojourns, which they admittedly cannot track." Culp , 840 F.3d at 409.
To its credit, the court today acknowledges there are reasonable alternatives to an outright ban when it comes to the initial application. See Maj. Op. at 655. Nonetheless, the court finds the issue with continued monitoring insurmountable. It says there is an "information deficit" about the ongoing eligibility of licensees that Illinois cannot overcome for any but those who reside in similarly situated states. But this deficit is not as severe as Illinois would have the court believe.
It is true Illinois maintains an extensive monitoring system to keep tabs on its own residents, including their voluntary mental-health treatments. Illinois says that because it cannot keep the same watchful eye on nonresidents, it must depend on those licensees' states to keep substantially similar eyes on them. In practice, this amounts to Illinois relying on national databases it *662 checks quarterly to make sure its nonresident licensees have no disqualifying issues. Several facts demonstrate that this system is not a "close fit" to Illinois's goal of ensuring an ineligible person is not allowed to keep his license.
To begin with, Illinois's failure to send out a new survey since 2015 significantly undermines its argument that its system is tailored to its goal. In 2013, Illinois decided Hawaii, New Mexico, and South Carolina were "sufficiently similar." But between 2013 and 2015, the laws in those states changed to the point Illinois felt it could no longer trust them. This evidences that laws and practices can materially change in a short amount of time. Nevertheless, Illinois has been content to let Arkansas, Mississippi, Texas, and Virginia remain undisturbed as "substantially similar" states since 2015, without even a check-up survey. Illinois's failure to ensure the states it trusts are still reliable weakens its assertion that depending on those states is critical to protecting its citizens.
Furthermore, relying on other states hardly provides the kind of systematic, up-to-date monitoring Illinois claims it needs. For one thing, two of the "substantially similar" states appear to rely on self-reporting of mental-health issues. Virginia, while it does track voluntary mental-health admissions, does so only by self-reporting. See Va. Response to Ill. Survey, App. 293 ("There is no systematic way of checking voluntary admissions in Virginia other than self reporting."). Arkansas indicated it relied on self-reporting as well. See Ark. Response to Ill. Survey, App. 147.[4] Yet these two states have systems upon which Illinois is willing to rely.
More generally, amicus Everytown for Gun Safety warns the court of the dangers of relying on "national databases to perform background checks...and to monitor permit holders' continued law-abiding status." Br. of Everytown for Gun Safety at 14. Amicus tells us it can take "over a year" for a felony conviction in Mississippi, a "substantially similar state," to find its way onto a national database. Id. at 17. Concerning mental-health reporting, amicus lists Arkansas among states that report mental-health records "at a per-capita rate that is aberrantly low compared to other states." Id. at 19-20 & n.29. Similar to the failure to send out new surveys, these reported deficiencies undercut Illinois's "close fit" argument.
As a final point, the "information deficit" could be worked around just like problems with the initial application. Instead of relying on these (potentially flawed) databases, Illinois could have nonresident licensees from substantially dissimilar states submit verified, quarterly updates on their statuses, including quarterly mental-health certifications.[5] In addition to allowing "law-abiding, responsible" citizens from every state in the Union to seek a license, this approach would have the added benefit of ensuring timely and accurate information the national databases cannot guarantee.
*663 III.
Illinois's scheme categorically prevents the law-abiding citizens from a vast majority of the country from even applying for the ability to exercise their constitutional right to bear arms in public for self-defense in Illinois. That crosses a constitutional line, and Illinois must do more than show its system "broadly serves the public good." See Binderup v. Att'y Gen. U.S. , 836 F.3d 336, 380 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments). It has not done so. I respectfully dissent.

Because I conclude the plaintiffs should succeed on their Second Amendment claim, I do not address their claims brought under other provisions of the Constitution.

At oral argument, counsel for Illinois said the State was "constantly sending out surveys," but there is no evidence of any survey after 2015.

However, as some recent cases indicate, see generally Kanter v. Barr , 919 F.3d 437 (7th Cir. 2019) ; Binderup v. Att'y Gen. U.S. , 836 F.3d 336 (3d Cir. 2016) (en banc), questions about whom a state may dispossess of gun rights are likely to be an issue in the future. Under some interpretations, Illinois's regime, which disqualifies based on a conviction for any felony, 430 ILCS 65/8(c), might go too far, see generally Kanter , 919 F.3d at 469 (Barrett, J., dissenting) ("Absent evidence that Kanter would pose a risk to the public safety if he possessed a gun, the governments cannot permanently deprive him of his right to keep and bear arms.").

In Arkansas's response to Illinois's survey, it said it requires an applicant for a license to "provide information concerning their mental health status at the time of application" but there is no "check or validation of the information provided by the applicant." Ark. Response to Ill. Survey, App. 147.

In suggesting Illinois could impose quarterly reporting and mental-health-certification requirements, I do not mean to suggest those would independently pass constitutional muster. But it is enough for the purposes of this case to conclude there are significantly less restrictive means of achieving Illinois's goal apart from an outright ban. See Moore , 702 F.3d at 942 ("[W]e need not speculate on the limits that Illinois may in the interest of public safety constitutionally impose on the carrying of guns in public; it is enough that the limits it has imposed go too far.").