# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
April 13, 2004 Session

## THE CITY OF HUMBOLDT, ET AL. v. J. R. MCKNIGHT, ET AL.

Appeal from the Chancery Court for Davidson County
No. 99-466-III     Ellen Hobbs Lyle, Chancellor

---

### No. M2002-02639-COA-R3-CV - Filed August 25, 2005

---

This lawsuit is about the operation and funding of public schools educating the children in Gibson County. Since 1981 the county has not operated a county school system, and all K-12 students have been in schools operated by the municipal and special school systems. The county ceased operating schools when a 1981 Private Act created the Gibson County Special School District. This arrangement was ratified by a 2002 Public Act stating that where all K-12 students are eligible to be served by city and special school systems, the county is not required to operate a separate county school system or have a county board of education. The trial court held that the 2002 Act was unconstitutional as special legislation and that the 1981 Act, though constitutional, was illegal. It ordered the dissolution of the Gibson County Special School District and that the county undertake operation of the schools not included in the other municipal or special school systems within the county. The court further found that the county was required to levy a countywide property tax to fund the local share of education costs and divide the proceeds among all school systems in the county. We hold that the 2002 Act does not violate Article XI, Section 8 of the Tennessee Constitution and, consequently, there is no obligation for the county to operate a county school system. We also conclude that the facts do not establish any disparity of educational opportunity among the school systems in the county and, consequently, the principles and holdings in the *Small Schools* cases do not apply to require a specific organizational structure and do not preclude the method used in Gibson County. Finally, we conclude the county is not required to levy a countywide property tax for schools. Accordingly, we reverse the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Kate Eyler, Deputy Attorney General; Kevin Steiling, Deputy Attorney General, for the State Defendant-Appellant.

Jerry D. Kizer, Jr., Patrick W. Rogers, Jackson, Tennessee, for the Defendants-Appellants, Gibson County, Gibson County Commission and its Members and Gibson County Board of Education and its Members.

Valerie B. Speakman, Memphis, Tennessee, for the Defendants-Appellants Gibson County Special School District and Its Members.

L.L. Harrell, Jr., Trenton, Tennessee, for the Defendants-Appellants, Trenton Special Schools District and Bradford Special School District.

Randall G. Bennett, Tennessee School Boards Association, Nashville, Tennessee, for the Defendants/Appellants J.R. McKnight, et al.

Lewis R. Donelson, Angie C. Davis, Memphis, Tennessee, for the Plaintiffs-Appellees, The City of Humboldt and Mayor and Aldermen of the City of Humboldt.

## OPINION

This suit challenges the unique method of operating and funding education in Gibson County whereby the county operates no schools, has no elected school board, and levies no countywide property tax to fund education. All students in Gibson County are served by either a special or municipal school district.

The plaintiffs, City of Humboldt and its officials, brought this suit alleging that Gibson County officials are acting in dereliction of their constitutional and statutory duties by failing to perform any educational role. The Gibson County Special School District, which serves the rural Gibson County students, is alleged to be the device whereby Gibson County avoids its responsibilities. The city also contends that a statute passed after the lawsuit was filed intending to address Gibson County's situation has no effect since it is special legislation in violation of Article XI, Section 8 of the Tennessee Constitution.

The Gibson County Special School District, serving the rural county students, opposes plaintiffs' request that it be dissolved and asserts that its existence and operation are not prohibited by law, but, instead, are specifically authorized. Gibson County argues that no law or constitutional provision places upon it the affirmative burden of operating a school system since all students in Gibson County are served by municipal or special school districts, and that the statute passed during this litigation specifically authorizing this arrangement is constitutional. Furthermore, the county claims that since each of the districts that serve the students collects a property tax assessed by either the city or the General Assembly that is more than sufficient to meet local funding requirements, it is not required to levy a countywide property tax for educational purposes.

# I. MATERIAL FACTS NOT IN DISPUTE

The trial court decided the merits of this controversy on cross motions for summary judgment. The trial court found, and the record reflects, that the following facts are not in dispute among the parties.

Since the creation of the Gibson County Special School District ("GCSSD") by Private Act in 1981, all students residing in Gibson County have been included in one of five (5) school districts. Since all students were served by either the GCSSD, the Trenton Special School District ("TSSD"), the Bradford Special School District ("BSSD"), the Milan Special School District ("MSSD") or the Humboldt City School System ("HCSS"), a municipal school district, the county itself operates no schools. All of Gibson County is included within the geographical boundaries of these systems. Each of these local school systems is separate and autonomous.

Prior to the creation of the GCSSD in 1981, Gibson County operated the Gibson County School System, and the Gibson County Commission levied a countywide property tax for education. According to the affidavit of Bill Carey, who served as Superintendent of Gibson County School System from 1978-81 and as Superintendent of the GCSSD from 1981-97, the impetus for formation of the GCSSD was the difficulty in obtaining adequate funding for the rural schools from the Gibson County Commission. Prior to 1981, according to Mr. Carey, there had been a constant struggle between the Gibson County Commission and the Gibson County Board of Education concerning adequate funding. Since 17 of the 25 commissioners sitting on the commission were from Trenton, Bradford, Milan, or Humboldt, it was perceived they were reluctant to levy a countywide property tax sufficient to fund the rural county schools at the expense of their urban districts. For this reason, the GCSSD was created by Chapter 62 of the Private Acts of the General Assembly of the State of Tennessee for 1981, as amended, and encompasses all of Gibson County not otherwise included within one of the four preexisting school districts. In the private act creating GCSSD, the legislature assessed a property tax on property within GCSSD to operate and maintain the school district.

Upon the creation of the GCSSD, Gibson County, in effect, went out of the education business since no students were left to serve. After 1981, Gibson County has not operated or administered a school system. The Gibson County Board of Education continued to exist but, after creation of the GCSSD, its members were no longer elected but appointed. In addition to disbanding the operational components of education, the county ceased funding education in Gibson County through property taxes and changed its property tax rate to reflect the elimination of funding for education. It continues to levy and collect a local option sales tax for education, which is apportioned among the school systems operating in the county.

All five (5) school districts in Gibson County are in compliance with the state's education standards and requirements under the state's Basic Education Program ("BEP"). Under the funding aspect of the BEP, the state must provide seventy-five (75%) percent of the state mandated education funds for classroom components and fifty (50%) percent of the state mandated education funds for non-classroom components. The local school systems collectively are required to fund the remaining

twenty-five (25%) percent and fifty (50%) percent respectively. Each system must contribute a minimum share based upon fiscal ability. Each of the five local school systems in Gibson County contributes more than its state mandated local share under the BEP. In other words, students in both Humboldt and the GCSSD receive more funds per pupil than is required under the BEP. The City of Humboldt spends more per pupil than any of the other systems in Gibson County.

Local governments generally fund their share of the BEP match through property taxes and the local option sales tax. Gibson County does not levy a countywide property tax to fund education since  property within each of the school districts is already taxed for education purposes. The private acts creating the GCSSD, the MSSD, the TSSD and the BSSD levy a property tax on the property located within their respective districts and specify the rate to be assessed. HCSS levies a property tax for education as authorized by the legislature. On the other hand, the local option sales tax is collected by Gibson County and then distributed among the five school systems on a weighted full-time equivalent average daily attendance ("WFEADA") basis. The creation of the GCSSD had no effect on Gibson County's collection of sales tax and its distribution of a portion of that sales tax to the five public school systems operating in Gibson County. There is no dispute that education is being funded in Gibson County in excess of that required by the state's BEP.

A comparison of key education components shows that in many respects the schools in Humboldt are outperforming the schools in the GCSSD. Quoting from the trial court's memorandum, relying largely on the 1997-98 Tennessee Report Card, the undisputed facts show:

(1)     During the 1997-1997 school year, the City of Humboldt maintained five (5) K through 12 schools, whereas GCSSD maintained six (6) K through 12 schools.

(2)     According to the Tennessee Report Card, "Accreditation by the Southern Association of Colleges and Schools (SACS) is something to which all public schools in Tennessee should aspire, and in fact, more are successful in achieving accreditation each year. Accreditation means not only that minimum standards are met, but also that the school community is committed to raising the quality of its program. For the 1997-1998 school year, 100% of Humboldt Elementary Schools were SACS accredited, and 50% of its secondary schools were SACS accredited, whereas 0% of GCSSD elementary or secondary schools were SACS accredited.

(3)     The Tennessee Report Card further states that, "The Tennessee General Assembly, believing that smaller classes increased students' chances of academic success, included class size standards in the Educational Improvement Act (EIA) of 1992 that will require lower class sizes for all grades by the school year 2001-2002. As of 1997-1998, 99.7% of City of Humboldt classes met the EIA class size standard and 100% of the Humboldt schools met the EIA standard, whereas only 99.1% of the GCSSD classes met

-4-

the EIA class size standard, and 100% of the GCSSD schools met the EIA class standard.

(4)     The Tennessee Report Card states that, "A wide range of instructional and support personnel is required to effectively operate a school system". Recalling that during the 1997-1998 school year, the City of Humboldt operated one less school than GCSSD, the City of Humboldt employed 13 administrators, 131 teachers, 14 student support personnel, and 158 total professional personnel, whereas, GCSSD employed only 7 administrators, 135 teachers, 9 student support personnel, and 151 total professional personnel.

(5)     According to the Tennessee Report Card, "The calculation of expenditures per student is intended to provide a basis for comparison among school systems of different sizes." . . . In the 1997-1998 school year, the per pupil expenditure in the City of Humboldt, was $4,313.00 per student, whereas, in the GCSSD the per pupil expenditure totaled only $3,327.00.

(6)     For the 1997-1998 school year, the City of Humboldt's average salary for teachers was $31,234.00, whereas, the average salary for teachers in the GCSSD was only $29,706.00.

(7)     For the 1997-1998 school year, state and local revenue per student in the City of Humboldt was $4,133.00 per student, whereas, in the GCSSD state and local revenue totaled only $3,846.00 per student.

(Citations to the 1997-98 Tennessee Report Card omitted).

Additionally, the record shows that the per pupil expenditure from property tax revenue for 1998-99 in Humboldt was $927.36 and for GCSSD was $776.21. In other words, Humboldt spends substantially more per student than GCSSD out of local property tax revenues as well as more per pupil from all sources.

Humboldt alleges that Gibson County is the only county in Tennessee that does not actually operate any schools.[1] It appears that this arrangement was not seriously examined or questioned until officials with the City of Humboldt apparently sought to relinquish the separate municipal school system in Humboldt. In August of 1994, and in November of 1998, the voters of Humboldt rejected referenda to transfer administration of the Humboldt City School System to the Gibson County Board of Education.

---

[1] Portions of the record and the parties' briefs suggest that all students in Carroll County are also served by special or other school districts and that Carroll County, like Gibson County, operates no K-12 schools. Carroll County operates certain other programs, such a vocational training, and collects a countywide property tax for education.

In February of 1999, the City of Humboldt, its Mayor, and Board of Aldermen (collectively "Humboldt") filed suit to challenge the way education is administered and funded in Gibson County.[2] The defendants ultimately named in the Amended Complaint can be classified in four (4) groups. First, the suit names those entities in Gibson County that plaintiffs believe are avoiding their constitutional and statutory duty: the Gibson County Commission, the Gibson County Board of Education, their respective members, and the Gibson County Executive (collectively "Gibson County"). Second, Humboldt names the district it seeks to abolish, the Gibson County Special School District, and its associated members (collectively "GCSSD"). Third, the lawsuit includes state officials as defendants: the Governor, Attorney General and Reporter, Commissioner of Education, State Board of Education, and Commissioner of Finance and Administration (collectively "State"). Finally, the suit names the other special school districts in the county, their members and superintendents (MSSD, BSSD, and TSSD).

According to Humboldt's Amended Complaint, since the GCSSD was created in 1981, Gibson County has avoided its constitutional and statutory duties to oversee education in Gibson County, operate a school system, and levy a countywide property tax in Gibson County. According to Humboldt, the failure to levy a countywide property tax to fund education results in a system of financing education that does not ensure a substantially equal educational opportunity to the students residing in Gibson County.

The Amended Complaint for Declaratory Judgment and Injunctive Relief asked the court to find that: 1) Gibson County is required to levy a countywide property tax to fund education to the minimum contribution requirements specified under the state's BEP; 2) Gibson County is required to oversee all school districts within Gibson County; 3) the Private Act of 1981, Chapter 62 creating the GCSSD violates the Tennessee Constitution Article XI, § 12, Article XI, § 8, and Article I, § 8 and state law since the GCSSD enables Gibson County to abdicate its countywide educational responsibilities. The Complaint asked that GCSSD be abolished.

## II. MOTIONS FOR SUMMARY JUDGMENT

In September of 1999, Gibson County filed the first in a series of Motions for Summary Judgment. Gibson County argued that its configuration of school systems is constitutionally sound and that state law does not require it to maintain and operate a school system or levy a countywide education property tax. Gibson County maintained that Humboldt's lawsuit is not about education but, rather, is an effort to adjust the tax burden to the advantage of the residents of Humboldt.[3] The Trenton, Bradford, and Milan Special School Districts joined in Gibson County's motion.

---

[2]The Humboldt City School System was later allowed to intervene.

[3]However, Gibson County also thinks the effort is misguided since, according to its calculations, a countywide property tax sufficient to meet the minimum BEP requirement would result in an eight cent per $100 increase in the tax rate in Humboldt.

On December 4, 2000, Humboldt filed a cross Motion for Summary Judgment asking the court to abolish GCSSD, order Gibson County to administer and fund schools in Gibson County, and order that the Gibson County Board of Education be elected.

Thereafter, the GCSSD filed its Motion for Summary Judgment on December 11, 2000. While the GCSSD argued the same positions as Gibson County, the motion filed by GCSSD primarily addressed the legality of the private act creating it. The trial court held a hearing on the parties' motions for summary judgment.

### III. THE TRIAL COURT'S ORDERS, SUBSEQUENT LEGISLATION, AND APPEAL

**A) Order on Motions for Summary Judgement**

On February 12, 2001, the trial court issued a Memorandum and Order on the cross motions for summary judgment granting Humboldt's Motion for Summary Judgment in part (hereinafter referred to as "Order"). The trial court found that Gibson County is violating Tennessee statutes governing education in three respects: (1) its failure to levy a countywide property tax for education; (2) its failure to maintain a "first rate" county high school; and (3) its failure to maintain a county administrative structure responsible and accountable to the State of Tennessee for public education in Gibson County. The trial court found the statutory scheme governing education in Tennessee "assumes and requires performance at a countywide level of [these] core responsibilities." In other words, the trial court found Tennessee statutory law requires the county to be the agency through which the state fulfills its education responsibilities. The county is then required to perform basic functions and is accountable to the state for the standard of education provided countywide.

The trial court reached this conclusion based upon several grounds. First, the court relied upon the codified organization of the education statutes. Due to the organization scheme, the trial court found that "Part 1, General Provisions, sets out general duties and obligations of local administration of schools." Based on this reasoning, the court found that Gibson County must perform all of the education tasks described in Tenn. Code Ann. § 49-2-101 even though Gibson County operates no schools. The trial court also relied on Tenn. Code Ann. § 49-2-101, which provides for duties of the county legislative body, including duties to levy taxes for county schools, oversee county boards of education and county directors of schools, adopt a budget for the operation of county schools, and provide sufficient funds to erect a suitable building and maintain at least one (1) first-class four-year high school.

Based on this statute, the trial court found Gibson County is required to adopt budgets for the operation of county schools, examine the accounts of the county schools, levy taxes to fund the budgets, and maintain one first class high school. The trial court, however, did not address why these obligations apply if the county operates no schools or, stated in the language of the statute, if there are no "county schools."

The second basis for the trial court's decision is the county's statutory duty under Tenn. Code Ann. § 49-2-102(a)(1) to provide education should a special or municipal school district terminate. This provision, according to the trial court "assumes the existence of a county system to fall back on." Therefore, the court reasoned the county must maintain a system for this purpose.

Third, the statute authorizing counties to contract with other entities to perform their educational duties is also cited by the trial court for support. Pursuant to Tenn. Code Ann. § 49-2-109, counties may contract with private schools or other school districts to provide education to county students. This option would be available although the private school or other school district has no pre-existing obligation to serve the county students. If a county elects to enter into such a contractual relationship, however, the statute also provides that the county retains its authority as though the students were in a county school. Tenn. Code Ann. § 49-2-109(a)(2). Therefore, since the county may not relinquish its authority in this contractual setting, the court reasoned by analogy that the county may not relinquish its authority over any student even if the legislature has created a special school district to serve the student.

Finally, the court found that Tenn. Code Ann. § 49-1-102 places the duty on the county to operate a school system. The language of Tenn. Code Ann. § 49-1-102(c) relied upon by the court is as follows:

> There shall be a local public school system operated in each county or combination of counties. There may be a local public school system operated in a municipality or special school district. Any local public school system shall be administered by
>
> (1) A local board of education; and
> (2) A superintendent or director.

The court concluded that since the statute requires that a local public school system be operated, then it must be the county that operates it. According to the court, this conclusion is mandated because "there must be a local body to be held accountable for and against whom the requirement that there be a local public school system operated in each county be enforced." In conclusion, the trial court found:

> Putting all the foregoing statutes together reveals that the statutory scheme enacted by the legislature is that the county legislative body is the legal entity responsible for public education across the county. Municipalities and special school systems can carve out a school or schools to operate, administer and provide additional funds. The county can contract with municipalities, special school districts or private schools to operate county schools. But the county legislative body is not permitted to remove itself or withdraw from education in the county. At a minimum it must levy a countywide property tax for education, and it must maintain a sufficient administrative structure to at least contract with another entity to fulfill

its statutory charge to erect and maintain one "first-class" high school[4] and to be accountable to the State.

The trial court declined to rule for Humboldt on several issues. The trial court found that Gibson County was not under a constitutional duty to provide substantially equal educational opportunities since the state bears this constitutional duty. The trial court also found that the private act creating the GCSSD did not violate the state constitution.[5]

> It was not the Private Act creating the Gibson County Special School District that repealed the countywide property tax or provided for the abdication of the county from education; these defalcations were committed by the county legislative body after the Private Act was passed.

The trial court found that Gibson County's statutory violations harmed Humboldt in two ways. First, the trial court found failure to levy a countywide property tax for education deprived Humboldt of its share of the tax. Second, the court reasoned that without the county serving in an oversight role, there is no single entity for the State to work with and hold accountable. The trial court also found, however, Humboldt was not able to show that the students in Humboldt were receiving an education that was inferior to the education being received by students in the GCSSD.

The trial court reserved the issue of remedies to be decided at a later date. The court noted that whether GCSSD should be abolished as part of the remedy would be decided later. The parties were invited by the trial court to consult their constituents for local input and to work together to fashion an appropriate remedy that addressed the deficiencies found by the court.

## B) First Remedy Order

After proposed remedies were submitted to the trial court by the parties, the trial court held an evidentiary hearing on September 20, 2001 regarding remedies. Thereafter, on November 8, 2001, the trial court entered its first order on the issue of remedies (hereinafter "First Remedy Order"). Humboldt's proposed remedy suggested the abolition of the GCSSD and assumption by Gibson County of GCSSD's responsibilities. The remedy presented by Gibson County and GCSSD provided for the election of the Gibson County Board of Education, appointment of a superintendent, and Gibson County's operation of a high school by agreement with the GCSSD. The proposed countywide tax basically would fund the high school. The trial court rejected both of these remedies.

---

[4]This is a reference to Tenn. Code Ann. § 49-2-101(8).

[5]In *Gibson County Special School District v. Palmer*, 691 S.W.2d 544 (Tenn. 1985), our Supreme Court addressed the constitutionality of the referendum provisions in a 1984 Private Act that allowed the property tax rate of the GCSSD to be increased. This 1984 Private Act, in effect, amended the 1981 Private Act creating the GCSSD by raising the property tax rate. The court found the referendum provision to be unconstitutional but applied the doctrine of elision to uphold the remaining provisions of the 1984 Act. *Id*. at 551-52.

In discussing the reasons why these proposed remedies were rejected, the court interjected for the first time a requirement that Gibson County have in place a "viable county school system for schools permissively maintained by the towns and cities to default to and fall back on upon surrender of their charter. . . ." Therefore, the trial court concluded for the first time that "to fulfill the requirements of section 49-2-1002(a)(1), the county must provide a county K through 12 system."

The trial court, however, also did not accept Humboldt's proposed remedy:

On the other hand, the Court seeks to avoid and stop short of abolishing the Gibson County Special School District, unless there is no other less intrusive remedy consistent with the law, because abolition is disruptive to the students and parents of the District. The Special School District has an identity important to its community. The Special School District has served well the students and parents of its district. Keeping in place the parochial benefits of operation of the high school by the same people with known policies and philosophies would provide continuity and security for parents and students of the District.

In its First Remedy Order, the court concurred with the proposed remedy suggested by the Attorney General.

The problem, then, is how to keep in place the community approval, support and security achieved by the Special School District but to require the County to step up to the plate in fulfilling its statutory obligation to maintain a county system capable of absorbing and operating city schools who surrender their charter.

The remedy is the one proposed by the Attorney General. That remedy allows the Gibson County Board of Education and the Gibson County Special Board to contract for the Special Board to operate the high school. The remedy, however, requires the County to also provide a county system for K through 8 education and to levy a true countywide tax. The remedy of the Attorney General spells out in more detail and thereby underscores the obligations of the County in the Agreement with the Special Board and eliminates the trigger provision. All of these modifications appropriately recast the County's role and require the County to assume its statutory obligation as the primary entity responsible for education in Gibson County.

Therefore, the court ordered the parties to submit a revised proposed remedy that followed the original remedy proposed by Gibson County and GCSSD but modified as suggested by the Attorney General. The court also ordered that the countywide property tax for education in the next proposed remedy must be sufficient to fund the local share of BEP for the GCSSD and "the shares of tax proceeds due to (MSSD, TSSD, BSSD and HSS) pursuant to Tennessee Code Annotated §§ 49-3-315 and 67-6-712 as calculated by the Tennessee Department of Education."

**C) Second Remedy Order**

On February 7, 2002, the trial court issued a clarification of its First Remedy Order upon request of the GCSSD. ("Second Remedy Order"). The court found that GCSSD's collection of property tax for it to meet the BEP match violates Tennessee law since Gibson County must fund the minimum BEP local match for GCSSD. The court found GCSSD was able, however, to tax for additional revenue that exceeded the match pursuant to the private act.

## D) Third Remedy Order

On May 22, 2002, the trial court issued yet another order on the revised remedies proposed by the parties (Third Remedy Order). At that juncture, Gibson County and the GCSSD were not able to agree on a joint remedy. The trial court reasoned that since Gibson County and GCSSD were unable to agree, then a contractual remedy was not possible. Therefore, the court accepted the remedy offered by Humboldt to abolish the GCSSD, ordered the imposition of a countywide property tax to fund the minimum BEP match, and ordered that Gibson County provide a kindergarten through twelfth grade school system.

> What the Court is faced with, then, is that the opportunity the Court provided the Gibson Defendants to effect a remedy consistent with Gibson County's statutory duties but short of abolishing the Gibson County Special School District has not been taken. That the Gibson County Commission, Gibson County Special School District and Humboldt have been unable to agree upon a contract means that a contractual remedy is not possible. Accordingly, the only remedy for curing Gibson County's statutory violations is to abolish the Gibson County Special School District. While the Court found in its February 12, 2001 memorandum and order that the 1981 Private Act establishing the Gibson County Special School District was constitutional, the Court is now compelled, by the failure of a contractual remedy, to declare that the Private Act establishing the Gibson County Special School District is illegal because the Act interferes with and prevents Gibson County from performing its statutory duties.

> It is therefore ORDERED that the Court declares the 1981 Act creating the Gibson County Special School District illegal on the grounds that the Act interferes and prevents Gibson County from performing its statutory duties.

## E) Legislative Amendment and the Court's Order on Constitutionality of That Amendment

On the same day that the trial court issued the Third Remedy Order, Chapter 770 of the Public Acts of the State of Tennessee for 2002 was signed by the governor amending Tenn. Code Ann. § 49-2-501 by adding the following subpart:

> (b)(2)(C) Notwithstanding any other provision of this title, in those counties in which all students in grades kindergarten through twelve (K-12) are eligible to be served by city and special school systems, the county shall not be required to operate a separate

county school system, nor shall it be necessary that a county school board be elected or otherwise constituted.

The amendment took effect July 1, 2002 (hereinafter called "Chapter 770").

Given the obvious potential impact of Chapter 770 to this case, Humboldt promptly filed a Motion for Declaratory Judgment and Injunctive Relief on May 31, 2002 seeking to have Chapter 770 declared unconstitutional. Although Humboldt's initial objection to the legislation concerned its caption being "overly broad," Humboldt's primary objection to Chapter 770 was that it allegedly violates Article XI, Section 8 of the Tennessee Constitution prohibiting special legislation.

Gibson County and GCSSD both filed motions to alter or amend the court's Third Remedy Order in light of the enactment of Chapter 770.

On September 23, 2003, the trial court found Chapter 770 to be unconstitutional on the ground that it is special legislation in violation of Article XI, § 8 of the Tennessee Constitution and enjoined its enforcement (hereinafter "Order on Chapter 770"). Without further elaboration, the trial court expressly adopted as its reasoning the arguments and authorities stated in Humboldt's reply brief.

**F) Appeal And Stay Of The Trial Court's Orders**

Timely appeals of the trial court's orders were filed by Gibson County and GCSSD. First, the parties allege the trial court erred in finding that Gibson County is required by state educational statutes to have and operate its own school system and levy a countywide property tax to fund education. (Order, First Remedy Order). Second, it is alleged that the trial court had no authority to abolish the GCSSD by declaring the Private Act creating it "illegal" absent a finding of constitutional infirmity. (Third Remedy Order). Third, the trial court is said to have erred in holding Chapter 770 unconstitutional. (Order on Chapter 770). Finally, the parties allege the trial court erred in the formulation of remedies. (First, Second, and Third Remedy Order). The State appealed the trial court's order finding Chapter 770 unconstitutional.

The trial court granted the defendants' motions to stay any proceedings to enforce the trial court's orders pending appeal.

**IV. CHAPTER 770**

By its adoption of Chapter 770, the General Assembly ratified the situation that currently existed as to the organizational structure governing the provision of education in Gibson County. Chapter 770 clarified the General Assembly's intent with regard to that structure and approved it. Thus, regardless of whether the statutory scheme prior to its enactment can be read, as the trial court did, to require a county to operate a school system, Chapter 770 clearly authorizes the arrangement present in Gibson County.

Accordingly, if Chapter 770 is a constitutional exercise of the legislature's authority over and discretion to provide a system of public education, questions regarding the original private act creating GCSSD and the subsequent removal of Gibson County from the operation of schools are no longer at issue. Because determination of the issues surrounding the validity of Chapter 770 may pretermit consideration of other issues, we begin there.

In its Order on Chapter 770, the trial court found that Chapter 770 constituted special legislation in violation of Article XI, § 8 of the Tennessee Constitution and permanently enjoined its enforcement. As its reasoning, the court expressly adopted the arguments and authorities stated in Humboldt's Reply Brief without further elaboration. According to this rationale, Chapter 770 is unconstitutional since it (a) violates the provisions of *Tennessee Small School Systems v. McWherter*, 851 S.W.2d 139 (Tenn. 1993) ("*Small Schools I*"); (b) contravenes the statutory system that designates counties to administer education; (c) represents unsound public policy; and (d) the rational basis for the legislation does not appear on its face.[6]

## V. THE *SMALL SCHOOLS* OPINIONS

Throughout its filings, Humboldt makes reference to constitutional protections of students and to the holdings of the Tennessee Supreme Court in a series of opinions in the *Small Schools* case. In concluding that Chapter 770 was unconstitutional, the trial court adopted Humboldt's rationale which included an argument that the amendment contravenes the provisions of the Tennessee Supreme Court's decision in *Small Schools I*, *supra*. In the second in the series, *Tennessee Small School Systems v. McWherter*, 894 S.W.2d 734 (Tenn. 1995) ("*Small Schools II*"), the Court restated its holding in *Small Schools I*:

> [T]he Tennessee Constitution guarantees to the school children of this State the right to a free public education and imposes upon the General Assembly the obligation to maintain and support a system of free public schools that affords substantially equal educational opportunities to all students.

894 S.W.2d at 734.

In *Small Schools I*, the Court held that Article XI, Section 12 of the Tennessee Constitution guaranteed a free public education and placed upon the General Assembly the duty to "maintain and support a system of free public schools that provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare students intellectually for a mature life." 851 S.W.2d at 150-51. The Court did not, however, find the current system unconstitutional on the basis of the education clause of the Tennessee Constitution. 851

---

[6]Humboldt does not renew this argument on appeal. The law is well-settled to the contrary. *Stalcup v. City of Gatlinburg,* 577 S.W.2d 439, 442 (Tenn. 1978); *Board of Education of Memphis v. Shelby County*, 207 Tenn. 330, 373-74 (1960) (opinion on pet. to rehear).

S.W.2d at 152 (holding that the extent the system did not comport with the education clause need not be determined).

Instead, the Court found the existing funding system created by the General Assembly was unconstitutional because it violated the Tennessee Constitution's equal protection clauses.[7] "These provisions of the Tennessee Constitution assure the nondiscriminatory performance of the duty created by Article XI, Section 12." 851 S.W.2d at 153.

The Court found that the record demonstrated substantial disparities in the educational opportunities afforded students across the state and that those disparities were caused principally by the statutory funding scheme. 851 S.W.2d at 156. The court also held that the proof failed to show a legitimate state interest "justifying the granting to some citizens educational opportunities that are denied to other citizens similarly situated." *Id.* Consequently, the statutory funding scheme failed the rational basis test.

In *Small Schools II*, *supra*, and *Small Schools III*, *Tennessee Small School Systems v. McWherter*, 91 S.W.3d 232 (Tenn. 2002), the Court continued to make clear that the question was substantial equality of educational opportunities. *See, e.g., Small Schools III*, 91 S.W.3d at 243 ("the educational funding structure [must] be geared toward achieving equality in educational opportunity for students, not necessarily 'sameness' in teacher compensation.") The focus in all three cases was on the funding structure, because that had been shown to be a primary cause of the disparities in educational opportunities across the state.

In *Small Schools II*, the Court found the General Assembly's solution through the Education Improvement Act, implemented incrementally, met constitutional requirements, with the exception of teacher salaries which were not included as a component of the methodology for funding costs.[8]

In *Small Schools III*, the Court found that the failure of the State to include teacher salary equalization in the formula applicable to other costs continued to be a significant constitutional defect and rendered the salary equity plan unsatisfactory in fulfilling the State's obligation to provide a system that affords substantially equal educational opportunity to all students. 91 S.W.3d at 243. This conclusion was based upon the Court's finding that there was no rational basis for excluding teacher salaries from a basic funding system consisting of cost-driven components. *Id.* The facts showed that wide disparities in teacher salaries still existed, and the Court found that such disparities "can lead to experienced and more educated teachers leaving the poorer school districts to teach in wealthier ones where they receive higher salaries." 91 S.W.3d at 242. The result was the continuation of constitutional inequities. *Id.*

---

[7] Article I, § 8 and Article XI, § 8.

[8] The Court warned that the exclusion of teacher salaries put the entire plan at risk functionally and, therefore, legally. 894 S.W.2d at 738. At the core of this decision was the Court's finding that teachers are the most important component of any education plan and a major part of any education budget, dismissing the State's argument that teacher salaries did not affect the quality of instruction or educational opportunity.

-14-

Thus, it is clear that the *Small Schools* case dealt with substantial equality of educational opportunity, the funding method that directly affected the quality of education and disparity of opportunity, and the General Assembly's duty to provide a funding scheme that assured substantially equal educational opportunities across the state. The "uniformity" that Humboldt asserts the Court required in the *Small Schools* opinions applies only to the provision of the components of a basic quality education and a substantially equal opportunity to obtain the benefits of that education.

The *Small Schools* case was about the method of funding schools. In the course of its opinions in that case, our Supreme Court also discussed the legislature's wide discretion in fashioning a statewide system that meets constitutional requirements.

> The power of the General Assembly is extensive. The constitution contemplates that the power granted to the General Assembly will be exercised to accomplish the mandated result, a public school system that provides substantially equal educational opportunities to the school children of Tennessee. The means whereby the result is accomplished is, within constitutional limits, a legislative prerogative.

*Small Schools I*, 851 S.W.2d at 156.

The legislature's plan to address the constitutional deficiencies found to exist in *Small Schools I* (including the BEP) contained both funding and governance provisions designed to provide the programs and services essential to basic K through 12 education across the state. 894 S.W.2d at 736. Funding was based on actual costs of 42 components identified as necessary to providing an education meeting constitutionally required standards. *Id*. With regard to governance, the Court found:

> The essentials of the governance provisions of the BEP are mandatory performance standards; local management within established principles; performance audits that objectively measure results; public disclosure by each local system of objectives, strategies, and results; removal from office of local officials unwilling or unable to effectively manage a local system; and final responsibility upon the State officials for an effective educational system throughout the State.

*Small Schools II*, 894 S.W.2d at 739. The Court found that each of the factors related to funding and governance was integral to the overall plan and indispensable to it. *Id*.

While the Court indicated that, along with a number of other factors, organizational structure could affect the quality and availability of educational opportunity, *Small Schools I*, 851 S.W.2d at 156; *Small Schools III*, 91 S.W.3d at 243, the Court did not impose any requirement for uniformity in organizational structure. To the contrary, the Court specifically recognized the General Assembly's wide discretion in designing a statewide system and also recognized the importance and expectation of innovation at the local level.

-15-

The focus on the funding method in *Small Schools* was based on the court's finding that the existing method was a primary cause of disparities in educational opportunities. Such a factual predicate has not been shown in the case before us with regard to the effect of the system of providing education that exists in Gibson County. There is simply no proof that the organizational structure in Gibson County adversely affects the quality of education delivered by any of the school systems or that there exists a disparity of educational opportunity between students in the Humboldt system and those in GCSSD. To the contrary, the record supports the trial court's finding that there was no showing that there was a disparity in the quality of education or the substantial equality of educational opportunities between the students of the two systems.

Because the existing system has not been shown to affect the rights recognized in *Small Schools I* and its progeny, Chapter 770, which ratified that system, also has no effect on those protected rights. Without proof of a causal connection between the organization structure for the provision of education to the students who live in Gibson County and any disparity in educational opportunities among them, the principles of *Small Schools I* and its progeny are simply not implicated.

Finally, *Humboldt* argues that in *Small Schools I* the Supreme Court found that the county was the instrument through which the legislature must comply with the constitutional requirement of substantially equal educational opportunities. We disagree and conclude the Court did not place such a restriction on the legislature. To the contrary, in all three *Small Schools* opinions, the Court repeatedly recognized the prerogative of the legislature in establishing a statewide system of public education as long as that system met constitutional requirements.

In *Small Schools II*, the Court found the legislative remedy adopted in 1992 met constitutional requirements. The Education Improvement Act and BEP apportion responsibility and accountability between the State and "local school systems." Consequently, the Court's discussion of the system used the same terms. For example, the Court recognized that the objective of providing programs essential to a basic education for public school children was to be "accomplished by defining the essentials of an effective education plan suitable for every local system." *Small Schools II*, 894 S.W.2d at 736. The Court made reference to governance and accountability being in the local systems, not in the counties. The "local system" develops a plan, and performance of the "local system" is monitored by the State. *Id*. at 737. The Supreme Court in its decisions in *Small Schools I* and *Small Schools II* did not limit the legislature's prerogatives on how it met its constitutional educational responsibilities to require that the legislature act through the county.

Because the Court reviewed the General Assembly's plan for compliance with the mandates of *Small Schools I*, and approved that plan with the exception of the teacher salary component, we cannot read the Court's opinions as creating organizational or structural requirements separate or different from those established by statute.

Consequently, we conclude that the structure through which the public schools in Gibson County are operated does not contravene any constitutional requirement imposed by the Court in the *Small Schools* opinions.

## VI. STATE SYSTEM FOR PUBLIC EDUCATION

The Tennessee Constitution requires that the General Assembly provide for the maintenance and support of a system of free public schools. Tenn. Constit., Article XI, § 12. Under this clause, the General Assembly has extensive power and discretion regarding the methods and means used to provide the public school system. *Small Schools I*, 851 S.W.2d at 156.

The system designed and maintained by the General Assembly is based upon direct delivery of educational services by local school systems or local education agencies. These entities may vary by name, method of creation, organization, or otherwise.

> "Local education agency (LEA)," "school system," "public school system," "local school system," "school district," or "local school district" means any county school system, city school system, special school district, unified school system, metropolitan school system, or any other local public school system or school district created or authorized by the general assembly.

Tenn. Code Ann. § 49-1-103(2). Thus, the General Assembly has the broadest discretion to create or allow various entities to provide educational services to children in the state. The statute not only recognizes existing entities, but also provides for new entities that might be created.

In addition to the types of local school systems identified, the General Assembly has also provided for additional variations. For example, Tenn. Code Ann. § 49-2-1101 *et seq.* provides that the boards of education of any two or more local school systems (including county school systems) may operate a school or schools jointly by contract. Under Tenn. Code Ann. § 49-2-1201 *et seq.*, multiple local school systems within a county may agree to consolidate. Additionally, county boards of education may combine to operate schools as a single multi-county consolidated school system. Tenn. Code Ann. § 49-2-1251 *et seq.*

In designing the education system in Tennessee, the legislature has clearly placed both responsibility and accountability in the local education agency, whatever organizational structure it might have. Throughout the statutes describing state administration of education, time and again the state places responsibility on the local education agency ("LEA") or local school system to fulfill local education responsibilities. Tenn. Code Ann. § 49-1-101 *et seq.* As set out above, the legislature has defined LEA or local school system to mean **any** system authorized by the legislature to deliver education. The following are examples of instances where the state places responsibility directly on the local system and the system is likewise accountable to the state:

-17-

a) the state is to designate fiscal accountability standards for local school systems to be used by the state to evaluate the fiscal operations of local school systems. (Tenn. Code Ann. § 49-1-210);

b) the state is to conduct performance compliance audits of local school systems and publish an annual report of the compliance and performance audits of the local school systems, showing incentives and sanctions applied to any local system (Tenn. Code Ann. § 49-1-211);

c) local boards of education shall perform annual financial audits and be accountable to the State Comptroller for those audits (Tenn. Code Ann. § 49-2-112);

d) performance goals are set for each school district in order to meet the goal that each school district have a mean gain equal or greater than the national norms. (Tenn. Code Ann. § 49-1-601);

e) the state is to designate a management information system to be used by the local school systems to report information to the state for internal control and system management (Tenn. Code Ann. § 49-1-209);

f) school systems may be placed on probation by the state for failing to meet state standards (Tenn. Code Ann. § 49-1-602). If a school system does not make progress to meet the standards for 2 years, the state may assume governance of the system but "the LEA will continue to be accountable for the match required by the BEP funding formula for students served." (Tenn. Code Ann. § 49-1-602(f)(1)(A);

g) the state is to develop and provide to the LEAs guidelines for evaluation of certified personnel and each LEA must develop an evaluation plan approved by the state to insure consistency with the state's guidelines. (Tenn. Code Ann. § 49-1-302(d)(1));

h) LEAs are expected to meet class size standards, Tenn. Code Ann. § 49-1-104;

i) the state is to coordinate with LEAs on family life education and preschool/parenting learning centers (Tenn. Code Ann. § 49-1-205 and 206);

j) the state is to provide technical assistance to the LEAs (Tenn. Code Ann. § 49-1-213);

k) the state is to develop advisory guidelines for LEAs about safety (Tenn. Code Ann. § 49-1-214);

l) each LEA is to submit a compliance report to the state on teacher planning periods (Tenn. Code Ann. § 49-1- 302(e)(2));

m) state coordinated health grants are available to LEAs (Tenn. Code Ann. § 49-1-1003).

It is clear that the legislature has placed responsibility and accountability for schools in this state in the agencies actually operating them - whether that agency be a county school district, a special school district, a municipal school district, or any other type of district authorized by the legislature. In fact, to the extent duties are placed on boards of education, it must be noted that the legislature has defined such boards as "the board of education which manages and controls the respective local public school system." Tenn. Code Ann. § 49-1-103(1).

In this statutory scheme of responsibility and accountability, the county has no role unless and to the extent it is actually operating a school system. Even then, it is the county school system, not the county government itself, that is accountable to the state for education. If a municipal or special school district is operating in a county, then that district is accountable to the state for the operation of the municipal or special school systems, not the county or the county school system.

Nothing in the statutes requires the county to oversee or be responsible for municipal, special, or other school districts that operate within the county's borders. To the contrary, the State is responsible for maintaining the system and ensuring its standards. The State Report Card appearing in this record, for example, demonstrates that reporting, accountability and other responsibilities lie with the individual school systems. The counties in which municipal or other school systems operate do not report for those systems and do not otherwise have a role between the state and those systems.

The General Assembly has provided for various entities to provide educational services at the local level. Local control is a desirable goal with benefit to the students.[9] The statewide system designed by the legislature recognizes differences in structure and organization, while consistently requiring one responsible unit: the local school system or local education agency.

Consequently, we cannot agree with the proposition that the county is the entity that is responsible for education of all students living in the county, even without Chapter 770. Neither the statutes nor actual practice supports such a statement.


## VII. SPECIAL LEGISLATION

---

[9] While the Supreme Court found that the benefits of local control do not justify the disparities in educational opportunity shown to exist in *Small Schools I*, in large part because local control did not require the funding scheme that created the disparities, it recognized the value of such control. *Small Schools I*, 851 S.W.2d at 154-55.

Article XI, § 8 of the Tennessee Constitution provides as follows:

General laws only to be passed. -- The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunities, or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

The Tennessee Supreme Court has interpreted Article XI, Section 8 to place limitations on the ability of the legislature to enact laws that benefit a county or counties or an individual or individuals unless such special legislation is supported by a reasonable basis.

In order for the provisions of Article XI, Section 8 to be triggered, a statute which is either local or local in effect must contravene some general law which has mandatory statewide effect. *Leech v. Wayne County*, 588 S.W.2d 270, 273 (Tenn. 1979); *see Rector v. Griffith*, 563 S.W.2d 899 (Tenn. 1978). In *Leech*, the General Assembly enacted a statewide scheme regarding county legislative bodies but, through population classifications, made exceptions for two counties. 588 S.W.2d at 273. The trial court found the exception for two counties violated Article XI, Section 8 of the Tennessee Constitution. *Id.* at 274. The Supreme Court declined to find the exceptions unconstitutional under that provision:

While a strong argument can be made in support of this conclusion, **in view of the broad powers which the General Assembly has with reference to the structure of local governments and their agencies**, we are reluctant to rest our decision on that provision of the state constitution nor do we find it necessary to do so.

*Id.* at 274. (emphasis added) The Court then continued its analysis to find the exception violated another provision of the constitution. *Id.* at 274.

At one time, caselaw suggested that the legislature had unlimited authority to enact private acts affecting local governments without violating Article XI, Section 8. *See Rector*, 563 S.W.2d 899 (Tenn. 1978); *Brentwood Liquors Corp. of Williamson County v. Fox*, 496 S.W.2d 454 (Tenn. 1973). The Supreme Court, however, has found "more authoritive" the caselaw that holds that the legislature may not suspend a general law with mandatory statewide application unless there is a reasonable basis for such departure. *Rector*, 563 S.W.2d at 903-04.

The *Rector* court also made clear that if there is no general state law that has mandatory applicability, then the legislature has "almost unlimited discretion to enact private legislation affecting the structure and organization of local government units." *Id.* at 904.

Thus, Article XI, section 8 is implicated only when the statute at issue contravenes (or suspends) some general law that has mandatory statewide application. *Riggs v. Burson*, 941 S.W.2d

44, 53 (Tenn. 1997) *cert. den.* 522 U.S. 982, 118 S.Ct. 444 (1997), citing *Civil Service Merit Board v. Burson*, 816 S.W.2d 725, 727 (Tenn. 1991); *Knox County ex rel. Kessel v. Lenoir City,* 837 S.W.2d 382 (Tenn. 1992).

Even where a statute contravenes general law or suspends the application of general law in specified circumstances, it does not violate Article XI, Section 8 if there is a rational basis for the distinctions made.

> Article XI, section 8 is implicated when a statute "contravene[s] some general law which has mandatory statewide application." *Civil Service Merit Board v. Burson*, 816 S.W.2d 725, 727 (Tenn. 1991); *Knox County ex rel. Kessel v. Lenoir City,* 837 S.W.2d 382 (Tenn. 1992). If a statute does suspend a general law, article XI, section 8 is not violated unless it creates classifications which are capricious, unreasonable, or arbitrary. *Civil Service Merit Board*, 816 S.W.2d at 727. If any reason can be conceived to justify the classification, it will be upheld as reasonable. *Stalcup v. City of Gatlinburg*, 577 S.W.2d 439 (Tenn. 1978).
>
> We need not determine whether the provisions cited by the plaintiffs are laws with mandatory statewide application. As already discussed, article XI, section 8 is commonly cited as one of two provisions which guarantee equal protection of the law under the Tennessee Constitution. **The analysis for determining whether a statute suspends a general law in violation of the Tennessee Constitution is similar to that for determining whether there is a rational basis for a classification.** As we have held, the statute, and the classification therein, is rationally related to several legitimate legislative interests. Thus, we conclude that it does not violate article XI, section 8 of the Tennessee Constitution.

*Riggs* 941 S.W.2d at 53-54. (emphasis added).

In other words, even if a statute contravenes a statute of mandatory statewide application so that it is special legislation triggering Article XI, section 8 inquiry, it may nonetheless pass constitutional muster under an equal protection analysis. The Supreme Court recently provided further guidance on the appropriate analysis under Article XI, Section 8:

> We have often recognized that the Class Legislation Clause of Article XI, § 8 is similar to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and this Court has previously applied Equal Protection analysis to questions arising under the Class Legislation Clause. *See*, *e.g., Riggs v. Burson*, 941 S.W.2d 44, 52 (Tenn. 1997). To this end, we have recognized that Article XI, § 8 "guarantees that persons similarly situated shall be treated alike" *Evans v. Steelman*, 970 S.W.2d 431, 435 (Tenn. 1998) (citation omitted), and that it 'prohibits the General Assembly from suspending the general law or passing any law inconsistent with the general law for the benefit of any individual [or group of

individuals]. . . ." *Finister v. Humboldt Gen. Hosp., Inc.*, 970 S.W.2d 435, 440 n. 3 (Tenn. 1998).

> However, the Class Legislation Clause does not remove from the General Assembly all power to draw classifications distinguishing among differing groups. "The initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States, and the legislatures are allowed considerable latitude in establishing classifications and thereby determining what groups are different and what groups are the same." *State v. Smoky Mountain Secrets, Inc., 937 S.W.2d 905, 912 (Tenn. 1996) (quoting Plyler v. Doe*, 457 U.S. 202, 216, 102 S. Ct. 2382, 72 L.Ed.2d 786 (1982) (internal quotation marks removed)). Therefore, unless the classification "interferes with the exercise of a 'fundamental right' or operates to the peculiar disadvantage of a 'suspect class,' Article XI, § 8 requires only that the legislative classification be rationally related to the objective it seeks to achieve. *See, e.g., Newton v. Cox*, 878 S.W.2d 105, 110 (Tenn. 1994).

*City of Chattanooga v. Davis*, 54 S.W.3d 248, 276 (Tenn. 2001).

Therefore, unless a fundamental right or suspect class is involved, legislative classifications are examined to determine whether there is a rational basis for the classification.[10]

## A.  Class Legislation

As discussed earlier, the first burden a party challenging a statute as unconstitutional class legislation must meet is to show that the statute contravenes general law of statewide mandatory application. *Civil Service Merit Board*, 816 S.W.2d at 731. The "general law" being contravened usually means a statute. *Id.* The State defendants, through the Attorney General, argue, along with Gibson County, that Chapter 770 does not contravene generally applicable law. We agree.

The General Assembly's duty to provide a system of public schools is accomplished in general terms in Tenn. Code Ann. §§ 49-1-101 through -104. "There is established a system of public education." Tenn. Code Ann. § 49-1-101. Significantly, "The system of public education in Tennessee shall be governed in accordance with laws enacted by the general assembly . . . ." Consequently, it is the entire set of statutes governing public schools that establishes the system. That necessarily includes Chapter 770, codified at Tenn. Code Ann. § 49-2-501(b)(2)(C), which is in the chapter on local administration.

---

[10]No party to this matter attempted to argue that a heightened level of scrutiny was appropriate, and all parties cast the issue in terms of whether or not Chapter 770 was supported by a rational basis. No fundamental right or suspect class is implicated by Chapter 770. There is no fundamental right to a particular administrative structure to deliver public education. There is no fundamental right to have the county, as opposed to a local school system operate the schools and be accountable to the state for that operation. Furthermore, there is no evidence in the record that Chapter 770 adversely affects any suspect class

As shown in the preceding section of this opinion, the General Assembly has designed a plan for statewide education that is based on local school systems as the entities responsible for the delivery of educational services to students in this state. It has also created and authorized various organizational structures for such local school systems, including possibilities that no school systems have chosen to adopt yet (such as combining county school systems).

Chapter 770 ratified the situation already existing in Gibson County. It clarifies that where all students living in the county attend schools operated by municipal or special school districts, there is no requirement that the county operate a school system. This arrangement is simply another form of organizational structure added to those specifically recognized in the statutory scheme. Consequently, Chapter 770 merely amends the laws whereby the General Assembly has provided for a system of public education.

Just as the General Assembly has the broadest discretion in designing the statewide system of public education, it necessarily has discretion to authorize various organizational structures within that system. That includes discretion to create new entities or organizational structures and to modify or eliminate others.[11] Similar amendments in furtherance of legislative purpose regarding the provision of a school system are routinely made.

While Chapter 770 ratified the situation that existed in Gibson County since 1981, it is not limited by its terms only to that county. For example, while Humboldt disputes that Carroll County falls within the purview of Chapter 770, its description of the Carroll County system indicates otherwise. According to Humboldt, Carroll County has an elected school board and operates a vocational school, a special education program, and a GEC Plus 2 program. Apparently, it does not operate K through 12 schools. If that is the case, all the students in the county in grades kindergarten through twelve are eligible to be served, and apparently are being served, by city and special school systems. Consequently, under Chapter 770, Carroll County would not be required to operate a separate county school system or have a county school board.

Similarly, while the situation in other counties may not currently meet the requirement for the application of Chapter 770, the potential exists for that situation to develop in other counties. Although current statute prohibits the creation of new special school districts, Tenn. Code Ann. § 49-2-501 (b)(3), there is no prohibition on increasing the size of existing special school districts. Such decisions are within the legislature's prerogative.

Consequently, we cannot find that Chapter 770 contravenes a statute of mandatory statewide application.

---

[11]For example, Humboldt places great significance in parts of its brief on legislation adopted in 1982 that prohibited the creation of new special school districts after April 30, 1982. Tenn. Code Ann. § 49-2-501(b)(3). That legislation also abolished existing special school districts that were not taxing districts. Tenn. Code Ann. § 49-2-501(a)(1). Statute also limits the number of special school districts in counties with specified populations. Tenn. Code Ann. §49-2- 501(b).

**B. Rational Basis**

Even if Chapter 770 were found to constitute special or class legislation, it nonetheless would not violate Article XI, Section 8 if it is rationally related to a legitimate legislative interest. In applying the rational basis test, courts presume that the legislature acted constitutionally and will uphold the statute "if any state of facts can reasonably be conceived to justify the classification or if the reasonableness of the class is fairly debatable . . ." *City of Chattanooga*, 54 S.W.3d at 276 (quoting *Bates v. Alexander*, 749 S.W.2d 742, 743 (Tenn. 1988); *Phillips v. State*, 202 Tenn. 402, 410-11, 304 S.W.2d 614, 617 (1957); *Knoxtenn Theatres v. McCanless*, 177 Tenn. 497, 505, 151 S.W.2d 164, 167 (1941). The party attacking the statute bears the burden of showing that the classification does not rest upon a reasonable basis. *Stalcup*, 577 S.W.2d at 442; *Estrin v. Moss*, 221 Tenn. 657, 667, 430 S.W.2d 345, 349, (1968) *cert. den*. 393 U.S. 318 89 S.Ct. 554 (1969). It is not necessary that the reasons for the special legislation appear on the face of the legislation. *Stalcup*, 577 S.W.2d at 442; *State ex rel Melton v. Nolan*, 161 Tenn. 293, 296, 30 S.W.2d 601, 602 (1930).

Applying this standard leads to the conclusion that Chapter 770 is supported by a rational basis and furthers a legitimate governmental interest. First, and most obviously, the legislature may prefer to avoid bureaucratic duplication. All students in Gibson County are served by municipal or special school districts which have their own governance structure. Like counties, these school districts are creatures of the legislature and are accountable to the state. It is not reasonable to require that the county operate an administrative structure that would merely duplicate that of the existing school systems. Additionally, where all students in a county are served by municipal or special school systems, with good results, it is not reasonable to require that students be moved to a new school system with different governance.

Second, Chapter 770 resolves any potential ambiguity as to whether the county is to act as a "middle man" between the state and the school districts delivering the education. As discussed previously, the state looks to the local school systems for accountability and performance. To the extent the trial court's rulings in this case triggered the adoption of Chapter 770, the legislature has a legitimate interest in clarifying its intent.

Finally, if one were to agree with the trial court that without Chapter 770 the GCSSD must be either abolished or otherwise rendered ineffectual, then the avoidance of this upheaval in Gibson County is yet another legitimate legislative interest. As the trial court found at one point, keeping GCSSD would maintain the community approval and support the special school district enjoyed and lessen insecurity among the students and parents in GCSSD schools. Confidence in the school system is an important goal, and that confidence had been earned by GCSSD's performance.

Therefore, Chapter 770 clearly has a reasonable basis.

For these reasons, we reverse the trial court and find Chapter 770 to be constitutional.[12] Accordingly, the trial court's holdings that Gibson County must operate its own school system and have a school board are reversed. Further, the trial court's order that GCSSD be abolished and its schools transferred to the county school system is also reversed, that remedy having been rendered moot.

## VIII. COUNTYWIDE PROPERTY TAX

The issue left to be resolved is whether the county must levy a countywide property tax to fund the minimum BEP match for the schools in Gibson County, even though there is no county school system, and distribute the proceeds among the systems in the county. Humboldt argues that the BEP requires that counties contribute to the cost of education by levying a countywide property tax for education sufficient to fund the local match for minimum funding under the BEP for all systems in the county. The revenue then must be distributed to the local school systems according to a formula based largely on student population. This method, according to Humboldt, assures that money follows the children, whereas under the method in effect in Gibson County, property tax revenue is collected on property within each local school system and kept by that system. Consequently, schools are supported according to the location of the property taxed.

Humboldt argues that only a countywide tax conforms to the requirements of the *Small Schools* opinions because otherwise, there exists the inherent possibility of inequity among the systems. "Gibson County's failure to fully fund the local BEP match for each district creates a situation where there is substantial fiscal capacity disparity among school districts."[13] According to Humboldt, without a countywide tax, funding disparities can occur, and the current method of funding schools in Gibson County violates *Small Schools I and II* because there is no mechanism available to provide for equalization based upon the fiscal capacity of the separate districts within the county.

Based on the record before us, we must conclude that it is the potential for inequity, rather than any actual inequity, in educational opportunity that Humboldt complains of. The record is full of uncontradicted evidence showing that the students served by the five (5) school districts in Gibson County are receiving more than the minimum funding required by the BEP formula and that all five (5) of the districts are in compliance with the state requirements under the BEP. When we look to the students in Humboldt, we find that Humboldt spends more per pupil than any of the other districts in the county. A comparison of the quality of education between Humboldt and the GCSSD in terms of accreditation, class size, staff, teacher's salaries, and amount spent per pupil reveals that

---

[12]Alternatively, Humboldt argues on appeal that Chapter 770 never came to bear on the GCSSD since the trial court ordered the GCSSD abolished in May of 2002 and Chapter 770 did not become effective until two months later, in July of 2002. In fact, the trial court's third remedy order was entered the same day Chapter 770 became effective and remained subject to modification and to post-judgment motions, which is what were filed herein.

[13]As Humboldt asserts, the fiscal capacity component of the BEP is measured on the basis of the county since statistical data is not available for smaller units.

Humboldt schools outperform the schools of GCSSD.  No substantial disparities in educational opportunity have been shown to exist.

Disparity of educational opportunity afforded students across the state was the basis for the holding in *Small Schools I* that the state's system for funding education violated the Tennessee Constitution.  The Tennessee Supreme Court made it clear that the *Small Schools* case was about the quality of and equality of opportunity for education and not "equality of funding."  851 S.W.2d at 156.

The BEP was approved by the Court as meeting constitutional requirements and its basic components discussed.  *Small Schools II*, 894 S.W.2d at 736-37.  The objective of providing programs and services to K-12 students across the state is accomplished through the BEP by (1) determining the cost of an adequate basic education for each local school system,[14] (2) allocation of funds to each local school system based on those costs; (3) funding to be provided by the state; and (4) the minimum funding to be provided by local systems.  *Id.*  The amount of funds collected locally does not affect the funding provided to a local system.  A proportionate share of the total cost of the BEP is assigned to each local system based on its county's relative fiscal capacity.[15]  894 S.W.2d at 737.

The BEP and the Court allow for differences in funding among the school systems.  The BEP provides for a minimum of state and local funding to provide a basic education.  Local systems are permitted to collect and spend money beyond the minimum to provide additional programs and services or otherwise improve the quality of education in their systems.

That is what is happening in Gibson County.  Humboldt, which as a municipality can levy and collect property taxes, levies, collects, and spends more local tax revenue per pupil than is provided to or spent by the other school districts.  Humboldt spends substantially more per pupil than GCSSD; it is not required to do so, but has made that choice.  GSSD also provides considerable additional funds beyond the required BEP local match.

It is important to remember that Gibson County levies and collects a local option sales tax for education that is apportioned among the local school systems according to the appropriate formula.  This tax revenue goes toward the local BEP match.

There is simply no showing that the method used in Gibson County to raise revenue for schools has resulted in any disparities in educational opportunities.  Neither has there been any showing that a countywide property tax levied, collected, and distributed by Gibson County would affect educational opportunity.  The local system's minimum share of the BEP would not change.

---

[14]This calculation involves a formula that takes into account the variations in costs across the state.

[15]A county's fiscal capacity is based on sales tax base, property tax base, and income.  Each county's capacity is calculated as a percentage of the total capacity of all counties.  894 S.W.2d at 737.

The amount provided by the state for each local system would not change. Local school systems could still raise and spend more than the required BEP minimum. We have not even been shown how a countywide property tax would result in greater funding or educational opportunity for Humboldt schools and students.

The *Small Schools* opinions dealt with the method of distributing funds to achieve more equal educational opportunities and required the state to assume a larger share and to insure distribution of funds raised locally as well as by the state in a manner that would achieve that goal. "Each local government is required by statute to appropriate the funds determined to be its share." *Small Schools II*, 894 S.W.2d at 737. The Court did not address taxing methods or how revenue for education was to be raised. "Appropriate" is not the same as tax. While the Court was concerned with how revenue was distributed, it did not delve into taxation, an area largely within the broad discretion of the legislature.

Consequently, the failure of Gibson County to levy and collect a countywide property tax for education when it is not required to operate a county school system, when it levies and collects a countywide local option sales tax for schools, and where there is no disparity in educational opportunity among the local school systems attributable to the current method of taxation does not run afoul of any of the constitutional principles established in the *Small Schools* case. We can find no basis in *Small Schools* to require Gibson County, as a matter of constitutionally required substantial equality of education, to levy and collect a countywide property tax.

Consequently, Humboldt's case must rest upon a statutory requirement that every county levy a countywide property tax for education and allocate the revenues among all school districts in the county. That inquiry, however, must be undertaken in the context of the General Assembly's authority and action in the exercise of its taxing authority.

The legislature may not delegate taxing power beyond the extent allowed by the state constitution. *Gibson County Special School District v. Palmer*, 691 S.W.2d at 549; *B.O. Keesee et al. v. The Civil District Board of Education*, 46 Tenn. at 128-29. The Tennessee Constitution allows the legislature to delegate its taxing power to counties and towns. Article 2, § 29. *B.O. Kessee*, 46 Tenn. at 128-29. This taxing power may not be delegated to special school districts. *Gibson County Special School District v. Palmer*, 691 S.W.2d at 549; *Williamson v. McClain*, 147 Tenn. 491, 249 S.W. 811, 814-15 (1923).[16]

Statutes governing special school districts and municipal school districts clearly anticipate that property owners within the district will be taxed by private act of the General Assembly. It is also significant that those statutes contradict Humboldt's premise that all property in the county must be taxed at the same rate by the county for schools. Tennessee Code Annotated § 49-2-106 provides

_____

[16]All parties and the trial court appear to have assumed that a special district has the authority to levy a tax and thus the issue became whether the county or the special school district had the obligation to levy the property tax to fund education in the first instance.

that no municipal or special school districts may be created unless certain conditions are met, including:

> The expressed willingness of the people of such city or special school district, as indicated by a majority of its legal voters in a referendum, to raise local funds which, together with school funds received from the state and other sources, shall be sufficient to provide adequate educational opportunities for their children.

Tenn. Code Ann. § 49-2-106(b)(3). The county is not specifically mentioned as a source of revenue. Furthermore, Tenn. Code Ann. § 49-2-107 specifically provides that property owners in special school districts must pay the property taxes levied by the private act creating the special school districts. It is clear, contrary to Humboldt's argument, a condition of municipal and special school districts is that schools in those districts be supported largely by taxes on the property in that district.

The private acts creating the special districts in Gibson County, including the GCSSD, each set the amount of the property tax to be assessed in that district. The legislature, therefore, has directly exercised its authority to levy a property tax to fund education in the special school districts in Gibson County.[17] Judging by the fact that each district is adequately funded, even exceeding the BEP requirement, the inescapable conclusion is that the legislature has levied a property tax sufficient to fund the BEP match for the special school districts in Gibson County.

This conclusion is further supported by Tenn. Code Ann. § 67-5-1704(c) and (d) which provides that in counties with a population of less than 50,000, the legislature shall set the property tax rate "necessary" for the special school districts. It is, therefore, the legislature that has assessed the property tax necessary for these special school districts, including the GCSSD.[18] There is nothing in these statutes which speaks in terms of the legislature simply "supplementing" the county tax as suggested by counsel for Humboldt. For these reasons, we find that in Gibson County the legislature has exercised its authority to tax property in the special school districts sufficient to fund the district's share of the BEP.

The General Assembly has itself exercised the authority to tax property for schools in the special school districts. This action, and the statutory scheme requiring or authorizing it, contradicts the basic premise of Humboldt's argument: that the county is the instrumentality selected by the

---

[17]As for the municipal school district in Gibson County, the legislature delegated to Humboldt its authority to levy a property tax to fund education. Tenn. Code Ann. § 49-2-401.

[18]Tenn. Code Ann. § 67-5-1704(d) provides it is not applicable to any county of the first, second, or third class as defined in Tenn. code Ann. § 8-24-101. Tenn. Code Ann. § 8-24-101 defines these three (3) classes as having populations of over Fifty Thousand (50,000) people according to the most recent federal census. *See* Tenn. Code Ann. § 8-24-101(a)(1)(2)(3) and (b). The 2000 census population for Gibson County was Forty-Eight Thousand One Hundred Fifty-Two (48,152), thus making Tenn. Code Ann. § 67-5-1704 applicable.

legislature to levy and collect the local school systems' share of the BEP.[19]  We must analyze the statutes relied on by Humboldt and the trial court in light of the General Assembly's authority and actions in the area of taxing for special school systems.

It is also relevant to the proposition that the county is responsible for levying a countywide property tax to fund schools located in the county that the statute authorizing cities like Humboldt to tax property for school purposes recognizes that the county may not provide revenue.  The statute governing municipal school tax clearly anticipates that circumstances may exist whereby the county may not levy a countywide property tax.

> No tax shall be levied and collected in any municipality for and in any year unless the county wherein same is situated shall fail or refuse, on or before the April term of each year, to levy a county tax for common school purposes.  Nothing in this section shall be construed to prohibit any municipality from levying a school tax additional to the county school tax.

Tenn. Code Ann. § 49-2-401(c).

The trial court relied upon Tenn. Code Ann. § 49-2-101(6) for its statutory authority requiring Gibson County to levy a property tax for education since one of the duties of the county legislative body is to:

> (6) Levy such taxes for county elementary and county high schools as may be necessary to meet the budgets submitted by the county board of education and adopted by the county legislative body.

The question is whether this statute requires Gibson County to levy a property tax for education.  There are several ways to interpret this statute and under each interpretation Gibson County is not in violation of it.  First, we do not believe this duty to impose a tax requires that a property tax also be assessed when the legislature has already levied the tax, in the case of special school districts, and delegated its authority, in the case of municipal school districts, such that the BEP funding level is achieved.  The legislature itself assessed the rate of the property tax in the private acts creating the GCSSD, the TSSD, the BSSD, and the MSSD.  Obviously, the property tax rate assessed by the legislature for these special school districts is sufficient to fund education since all spend more for education than the BEP minimum.[20]  Therefore, it is not "necessary" for the county to levy a property tax.

---

[19] It is important to note that the issue is not whether a county must assess a countywide property tax to fund education but whether a county must also do so when the entire county is already being taxed by the legislature or municipality.  There is no question that absent taxation by the legislature the county would bear this responsibility.

[20] As discussed earlier, Tenn. Code Ann. § 67-5-1704(c) specifically requires the legislature to "set the tax rate for [each] special school district at a level to generate the ad valorem revenue necessary for such special school district."

Second, since Gibson County is not required to operate schools or to have a board of education, there are no county schools and no budget for county schools to fund. Therefore, Gibson County cannot be faulted for failing to fund a non-existent budget.[21] For these reasons, we do not believe Tenn. Code Ann. § 49-2-101(6) places an obligation on Gibson County to assess a countywide property tax to fund the minimum BEP share for all the local school systems in the county.

Chapter 3 of Title 49 deals with "Finances" for education. Humboldt relies on several statutes in that chapter. Part 3 (the Education Finance Act) begins with the announcement that it establishes the procedure for "the funding of education for the public schools, grade kindergarten through twelve (K-12)." Tenn. Code Ann. § 49-3-303(a). Part 3 establishes the only procedure for funding K-12 education. Tenn. Code Ann. § 49-3-304. The distribution of state funds is governed by Tenn. Code Ann. § 49-3-314, and such funds are distributed directly to the local education agencies or local school systems. Tenn. Code Ann. § 49-3-315(b)(2).

Tenn. Code Ann. § 49-3-315 is specifically relied on by Humboldt, and it provides in pertinent part:

(a) For each LEA there shall be levied for current operation and maintenance not more than one (1) school tax for all such grades as may be included in the LEA. Each LEA shall place in one (1) separate fund all school revenues for current school operation purposes received from the state, county and other political subdivisions, **if any**. . . . All school funds for current operation and maintenance purposes collected by any county . . . shall be apportioned by the county trustee among the LEAs therein on the basis of the WFTEADA maintained by each, during the current year. (emphasis added).

This statute does not require every county to levy a countywide property tax for all school systems located within the county. It authorizes one levy for each LEA or school system, regardless of what entity makes the levy. It speaks in terms of school taxes, not property taxes. It specifically recognizes ("if any") that there may be no revenue from the county. It establishes the method of distribution of any school taxes that may be collected by the county. Gibson County distributes its sales tax for education in accordance with that method.

Notwithstanding the exclusive method of funding language in Tenn. Code Ann. § 49-3-304, the statutes comprising the BEP, Tenn. Code Ann. §§ 49-3-351 *et seq.*, establish "the only procedure for the funding of the BEP, kindergarten through grade twelve (K-12)" in the form of the formula prescribed. Tenn. Code Ann. § 49-3-351(b). These provisions require each LEA to establish a fund for "all appropriations from all sources to fund education." Tenn. Code Ann. § 49-3-352(b). State funds under the BEP formula are distributed directly to each LEA. State and local contributions are

---

[21]We also note that the county is collecting a local option sales tax, and the statute does not prescribe a property tax.

defined as percentages of the cost of components. Tenn. Code Ann. § 49-3-356. That statute also provides:

> Every local government shall appropriate funds sufficient to fund the local share of the BEP. No LEA shall commence the fall term until its share of the BEP has been included in the budget approved by the local legislative body.

This statute deals with appropriation, not raising revenue or taxing. Obviously, the reference to a school budget approved by the local legislative body applies only to those local school systems whose budgets must be approved by such a body. Although the reference to "local governments" creates some ambiguity,[22] we cannot read the statute as requiring that a county that operates no county schools is required to levy a countywide property tax for schools. In the context of the organizational structure of special school districts and the authority of the General Assembly to levy taxes for those districts, we interpret local government to mean the governing body of the system with authority to appropriate revenue. The statute does not address how revenue is raised. Each local school system in Gibson County collects, from the property tax levied by the General Assembly or the City of Humboldt, from sales tax revenue from the county, and elsewhere, the money needed for its local match under the BEP. We think that is the purpose of the language quoted.

We have examined the other statutes cited by Humboldt, and we find nowhere in these statutes a clear directive that counties must levy a countywide property tax to fund schools when the county operates no school system and when all schools in the county are funded through property tax levies by the General Assembly or the municipality operating a local system and with the county sales tax.

It would take a clear statement to overcome the statutes, including private acts, authorizing or requiring the General Assembly to levy taxes on property located in special school districts, statutes requiring that people in a special school district or a municipal school district raise local funds for schools in that district, and statutes recognizing the possibility that a county may not in fact provide funds to municipal or special school districts. We find no such clear statement in the statutes cited.

Humboldt argues that Gibson County should be required to levy a countywide property tax for schools because every other county does so. While uniformity has its benefits and is a desirable goal in many systems, it is the prerogative of the legislature, not the courts, to make that decision. The basic components of the BEP achieve equality of educational opportunity through funding. While the General Assembly could have required uniformity in how those funds are raised, it did not. Perhaps it thought it advisable to leave taxing methods alone in view of the varying entities that can provide education, their varying organizational structures, and the limitations on their taxing authority.

---

[22]School districts are local governmental entities. Tenn. Code Ann. § 29-20-102(3)(A).

We must conclude that there is no constitutional or statutory requirement that Gibson County levy, collect, and distribute a countywide property tax to fund the municipal and special school systems within the county.[23]  As a result, we reverse the trial court's holding to the contrary.

The trial court's judgment is reversed.  Costs are taxed to the appellees, the City of Humboldt, its Mayor and Board of Aldermen of the City of Humboldt, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[23]Humboldt has brought this case as one based on constitutional principles and statutes regarding education with the goal of ensuring protection of students' rights to equal educational opportunity.  It appears to us, however, that much of the real complaint is about taxation, taxpayers, and those who levy taxes.  For example, Humboldt argues that "equal educational opportunity requires that each student ought to have equal access to funding and, if a school district is required to levy a higher tax rate on its citizens than others within the county, then equal access has been impaired." This argument demonstrates what we perceive as an attempt to transform a tax issue into an education issue.  To resolve the issues as presented, we need not examine the information presented about tax rates, tax base, and tax yield in the various districts and need not determine whether any taxpayer disparity actually exists.  We simply note that the kind of disparity Humboldt complains of was recognized in the statutes allowing the creation of municipal and special school systems.  In any event, it has not been shown to have any effect on educational opportunities of the students.